United States *v.* American Shipping Co.

**No. 5299.**—Invoice dated Stockholm, Sweden, December 6, 1937.
Certified December 7, 1937.
Entered at Chicago, Ill., January 3, 1938.
Entry No. 7293.

First Division, Appellate Term

(Decided June 3, 1941)

*Charles D. Lawrence*, Acting Assistant Attorney General (*Samuel D. Spector*, special attorney), for the appellant.
*Tompkins & Tompkins* (*J. Stuart Tompkins* and *Allerton deC. Tompkins* of counsel) for the appellee.

Before Brown, Oliver, and Walker, Judges; Brown, J., dissenting

Walker, Judge: This is an appeal from the decision of Evans, J., sitting in reappraisement. The merchandise consists of grids for X-ray apparatus in four sizes which are referred to throughout the record by their inch and centimeter measurements as follows:

8 x 10 inches=20.5 x 25.5 centimeters
10 x 12 inches=25.5 x 30.5 centimeters
12⅝ x 13⅜ inches=32 x 34 centimeters
14 x 17 inches=35.5 x 43 centimeters

The merchandise was apparently shipped from Stockholm, Sweden, on December 7, 1937, and was entered on January 3, 1938, at the port of Chicago. The importer claims that the basis of value of three of the sizes, namely, 8 x 10, 12⅝ x 13⅜, and 14 x 17 inches, should be the foreign value as defined in section 402 (c) of the Tariff Act of 1930, and that the basis of value of the 10 x 12-inch grids should be the cost of production as defined in section 402 (f) of the same act. The defendant contends that the foreign value was the proper basis of value of all of the merchandise, and that the value in each case was higher than the value claimed by the importer.

The statutes cited, which have been changed in part by the Customs Administrative Act of 1938, at the time of importation of the merchandise read as follows:

SEC. 402. VALUE.

\*     \*     \*     \*     \*     \*     \*

(c) FOREIGN VALUE.—The foreign value of imported merchandise shall be the market value or the price at the time of exportation of such merchandise to the United States, at which such or similar merchandise is freely offered for sale to all purchasers in the principal markets of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade, including the cost of all containers and coverings of whatever nature, and all other costs, charges, and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States.

\*     \*     \*     \*     \*     \*     \*

(f) COST OF PRODUCTION.—For the purpose of this title the cost of production of imported merchandise shall be the sum of—

(1) The cost of materials of, and of fabrication, manipulation, or other process employed in manufacturing or producing such or similar merchandise, at a time preceding the date of exportation of the particular merchandise under consideration which would ordinarily permit the manufacture or production of the particular merchandise under consideration in the usual course of business;

(2) The usual general expenses (not less than 10 per centum of such cost) in the case of such or similar merchandise;

(3) The cost of all containers and coverings of whatever nature, and all other costs, charges, and expenses incident to placing the particular merchandise under consideration in condition, packed ready for shipment to the United States; and

(4) An addition for profit (not less than 8 per centum of the sum of the amounts found under paragraphs (1) and (2) of this subdivision) equal to the profit which ordinarily is added, in the case of merchandise of the same general character as the particular merchandise under consideration, by manufacturers or producers in the country of manufacture or production who are engaged in production or manufacture of merchandise of the same class or kind.

The court below found and held that foreign value was the proper basis of value for the following grids and that such value was as indicated:

```
 8   x 10   inch Skr. 100
12⅝ x 13⅝   "    "   150
14   x 17   "    "   180
```

and that cost of production was the proper basis of value for the 10 x 12-inch size and that such cost was 135 Skr.

It therefore appears that as to the first three sizes listed immediately above there is no dispute that foreign value is the proper basis of appraisement, but the Government contends that the values found by the appraiser are correct. These values are as follows:

```
 8   x 10   inch Skr. 165
12⅝ x 13⅝ inch  "  225
14   x 17   inch  "  275
```

On behalf of the importer there were offered before the trial court the testimony of one Lester L. Ludwigsen, assistant merchandise manager in charge of supplies and sales of supplies of the General Electric X-Ray Corporation of Chicago, the ultimate consignee; an affidavit of Georg Schonander of Stockholm, Sweden, the manufacturer, which was received in evidence over the objection of defendant as exhibit 1; a sample of the merchandise in suit (exhibit 2); price lists of the ultimate consignee dated November 1, 1937, and September 8, 1939 (exhibit 3); copies of an agreement made between the ultimate consignee and the manufacturer (exhibits 4 and 5); a catalog and price list of a customer of the ultimate consignee (exhibit 6); and certain invoices of goods shipped from the manufacturer to the ultimate consignee (collective exhibit 8). On behalf of the defendant there was offered a report of a Treasury attaché dated April 14, 1938, concerning an investigation made at the place of business of the manufacturer, which was received in evidence as exhibit 7.

Appellant specifically assigns as error the action of the trial court in admitting exhibit 1 over Government's objection and in giving any weight or consideration thereto. Exhibit 1 purports to be the affidavit of Georg Schonander, sworn to and subscribed before the American Vice Consul at Stockholm. It is in proper form, and of it the trial court said:

* * * Exhibit 1, the affidavit, is made by an interested party, a foreigner, although the affidavit is made in the English language with no showing that the affiant understood or could read or write the English language. Nevertheless, since the record shows that the affiant had visited this country, and made an agreement in this country in the English language, the court will indulge the presumption that he did understand the facts to which he made affidavit * * *.

We are satisfied the trial court committed no error in admitting and considering the affidavit in view of the situation outlined.

Error is likewise assigned to the action of the trial court in refusing to dismiss the importer's appeal for reappraisement upon the Government's motion made on the ground that importer had failed to make out a *prima facie* case. A review of the evidence offered on behalf of the importer shows that save as to the 14- x 17-inch size, it was sufficient, standing alone, to meet every material issue and warrant a finding in importer's favor, and we therefore find no error in the trial court's denial of Government's motion.

With respect to the three sizes of grids as to which both parties contend for foreign value, the chief point of difference appears to be the type of sale to be taken as the basis for the values contended for. It appears from a reading of the affidavit, exhibit 1, and the Treasury attaché's report, exhibit 7, that sales in Sweden for home consumption or for exportation to countries other than the United States were made to two classes of buyers, viz, to ultimate consumers,

such as doctors and hospitals, and to dealers, such as X-ray supply houses. There is no dispute that the usual quantity sold on each sale, whether to consumers or dealers, is one grid.

It appears that the manufacturer's prices to both classes of buyers were uniform during the period from September, 1937, to July, 1938. With respect to the 8- x 10-inch grid the affidavit, exhibit 1, shows that during that period, within which the date of exportation of the merchandise involved lies, the manufacturer made three sales to ultimate consumers, two at 165 Skr. and one at 164.10 Skr., and eight sales to dealers, five at 100 Skr. and three at 123.75 Skr. The trial court found that the major portion of sales was made at 100 Skr. and held that figure to represent the foreign value.

The appellant herein, the defendant below, contends that the trial court erred in holding that the price at which the major portion of sales of a given item was made represents the foreign value, and claims that the major portion of sales may only be considered in determining the usual wholesale quantity, and that the price at which all may purchase the merchandise in usual wholesale quantities and in the ordinary course of trade represents the dutiable value of the merchandise. Thus it is contended that although the major portion of sales, i. e., five, was made to dealers at a price of 100 Skr., nevertheless all purchasers could not obtain that price unless they were dealers, and the price did not depend upon the quantity purchased but upon the category of the buyer, viz, whether he was a consumer or a dealer.

We have examined the cases cited by the court below dealing with the rule concerning the major portion of sales and find that the rule was therein used to determine the usual wholesale quantity which controls the price for appraisement purposes. Here, as we have stated, the usual quantity was one grid, so there can be no question about different wholesale quantities. For that reason the rule as to the major portion of sales has no application here, and the trial court erroneously applied it.

As hereinbefore pointed out, ultimate consumers such as doctors and hospitals were charged a higher price than dealers, though both classes of customers bought in the same quantities, and the report of the Treasury attaché (exhibit 7) indicates that such higher price represented the price ultimate consumers would have to pay if they bought from dealers.

It is the contention of the appellant here, defendant below, that in arriving at the price at which grids such as those at bar were sold "to all purchasers" within the meaning of that phrase as used in section 402 (c), *supra*, the price at which ultimate consumers such as doctors or hospitals purchased such grids must be considered, since they purchased in the usual wholesale quantity of one grid. As supporting that position there are cited numerous cases, among which are *United*

*States* v. *Faber*, 21 C. C. P. A. 290, T. D. 46819; *United States* v. *American Glanzstoff Corp.*, 24 id. 35, T. D. 48308; *United States* v. *Semon Bache & Co.*, 25 id. 387, T. D. 49466, and *United States* v. *Mexican Products Co.*, 28 id. 80, C. A. D. 129.

It is the contention of the appellee here, plaintiff below, that sales to users (as distinguished from dealers) in units of one are not sales "in the ordinary course of trade," that is to say, that Congress did not intend to include consumer purchasers who buy the usual whole-sale quantities for consumption within the meaning of the phrases "to all purchasers" and "in the ordinary course of trade" used in section 402 (c), *supra*. As supporting appellee's position there are cited *Keve & Young* v. *United States*, 11 Ct. Cust. Appls. 94, T. D. 38747; *Globe Shipping Co.* v. *United States*, Reap. Dec. 3743; *United States* v. *Frederick George Co.*, Reap. Dec. 2304; *Railway Express Agency* v. *United States*, Reap. Dec. 3843, and *United States* v. *H. N. Hill & Co.*, Reap. Dec. 4008.

We have examined with great care the cases cited by both appellant and appellee. In none of the cases cited by the appellant was a situation such as that in the case at bar presented, that is to say, in none of them was a "usual wholesale quantity" determined to be one unit which was sold to different classes of buyers at different prices depending solely upon the category of the purchaser as a consumer or dealer. We do find, however, much therein which is helpful and which will be referred to later.

On the other hand, the situations which obtained in the lower court decisions cited by appellee were closely akin to that at bar. These lower court decisions appear to be based upon the decision of the Court of Customs and Patent Appeals in the case of *Keve & Young* v. *United States*, cited above. The *Keve & Young* case is cited for the proposition that sales to users in units of one are not sales in the ordinary course of trade. We do not think that that case stands for that proposition.

The merchandise involved in the *Keve & Young* case consisted of letter-press copiers manufactured by an English concern, Roneo, Ltd. In the language of the court, it appears that is was the policy of Roneo, Ltd.—

to retain absolute control in Great Britain of the distribution of its output and to eliminate completely the intervention of wholesale and retail dealers.

Although it maintained branch houses in Great Britain the latter merely took orders and sales were made direct from Roneo, Ltd., the manufacturer, to the consumer in single units. It was held that such sales were at retail prices which did not represent—

the actual market value * * * at the time of exportation to the United States, in the principal markets of the country from whence exported—

as defined in paragraph R of the Tariff Act of 1913. The term "actual market value" was defined in paragraph R as follows:

\* \* \* that such actual market value shall be held to be the price at which such merchandise is freely offered for sale to all purchasers in said markets, in the usual wholesale quantities, and the price which the seller, shipper, or owner would have received, and was willing to receive, for such merchandise when sold in the ordinary course of trade in the usual wholesale quantities.

We think a reading of the decision of the Court of Customs Appeals in the *Keve & Young* case indicates that it was predicated upon the *lack* of any sales of a wholesale character, that is to say, the market for the articles in Great Britain was limited only to consumers who purchased in single units, so that no possibility existed for the making of sales "in the usual wholesale quantities." In this way the situation there presented differs from that in the case at bar. Here we have sales made to dealers as well as to consumers, and in both cases the usual quantity sold appears to be a single unit.

For the same reason the situation herein differs from that which obtained in the case of *United States* v. *Livingston & Southard, Inc.*, 23 C. C. P. A. 214, T. D. 48060, since in that case, while the usual quantity sold to consumers was one, it appears that the usual quantity sold to dealers was more than one and less than six. The sales of single units to consumers were therefore held to be retail transactions involving retail quantities, while the sales to dealers were held to represent sales in wholesale quantities.

The adjective "retail" is defined in Funk & Wagnalls New Standard Dictionary as:

Of or concerned in the sale of goods in small quantities; as, a *retail* business.

while "wholesale" as an adjective is defined by the same lexicographers as:

1. Selling in quantity; not at retail; as, a *wholesale* druggist. 2. Done in buying and selling in quantity, as, the *wholesale* trade. 3. Pertaining to the wholesale trade; as, the *wholesale* price. 4. Hence, made or done on a large scale; made or done indiscriminately.

It is apparent from the foregoing that the ordinary distinction between wholesale and retail transactions rests upon the quantity involved in the transaction. Where, however, as in the case at bar, sales to consumers and sales to dealers are made in the same usual quantity, upon what basis may we, as urged by appellee, disregard the sales to the consumer?

Appellee contends that the distinction should be made by the business category of the purchaser, arguing that, considering the language:

freely offered for sale to all purchasers in the principal markets of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade

found in section 402 (c) *supra*, as a whole, it imports that only the prices involved in *wholesale* transactions, i. e., between persons or concerns engaged in the business of trading or dealing in the commodity in question with a view to making a profit, should be considered, as distinguished from the price paid in retail transactions, i. e., between seller and ultimate consumer or user. Along this line it is argued that the phrase "in the ordinary course of trade" should be:

construed to mean the trade *as such*, or those persons (traders) who make a business of dealing in, or both producing (or buying) and selling the imported article for profit, as distinguished from the consumer who buys for himself and does not sell.

We think this construction of the phrase would be forced and would constitute a limitation not warranted by the language of the statute. There are several reasons for this opinion.

First, it is a matter of common knowledge that many persons or concerns buy goods in wholesale quantities who are not engaged in the business of dealing in such goods. For example, hotels ordinarily buy furniture, chinaware, linen, etc., in wholesale quantities; and many manufacturers buy raw materials which they consume in the production of manufactured articles. Such purchases constitute a very large portion of trade in many lines, and had Congress intended to exclude such sales from the purview of section 402 (c), *supra*, it surely would not have used the term "to all purchasers." For example, see in this connection *United States* v. *Robinson & Co. et al.*, 19 C. C. P. A. 274, T. D. 45436, wherein it was held that where the manufacturer sold certain tie squares only to wholesalers, who, in turn, sold to the consumers, i. e., tie manufacturers, the sales price to the tie manufacturers should be accepted as the foreign value.

Second, it has been repeatedly held that the category of the purchaser has no bearing upon the determination of foreign value. In *United States* v. *Richard & Co.*, 15 Ct. Cust. Appls. 143, T. D. 42216, dealing with the provision in the Tariff Act of 1922 which was the predecessor of section 402 (c) of the Tariff Act of 1930, and which was couched in identical language, the court said:

It is argued because sales to wholesalers are all made at the same price that therefore this price thus becomes the wholesale price. But it will be observed that the statute does not thus establish the wholesale price. Section 402 (b) does not provide that the wholesale price shall be the price to *wholesalers*, but the price in the usual *wholesale quantities*. The law is not concerned with the persons who buy, but the manner in which they buy.

In *United States* v. *Mexican Products Co.*, *supra*, the Court of Customs and Patent Appeals, speaking through Judge Hatfield, said:

In determining foreign and export values, as defined in section 402 (c) and (d), respectively, it is proper to consider only the market values or prices at which merchandise like or similar to that inported is freely offered for sale *to all purchasers*

(not to the greater number, or to those of a particular class) in the principal markets of the country from which exported in the usual wholesale quantities and in the ordinary course of trade. See *United States* v. *A. W. Faber, Inc.*, 21 C. C. P. A. (Customs) 290, T. D. 46819; *Stone & Downer Co.* v. *United States*, 21 C. C. P. A. (Customs) 479, T. D. 46958; *United States* v. *American Glanzstoff Corp.*, 24 C. C. P. A. (Customs) 35, T. D. 48308.

In the latter case, referring to the definition of "foreign value" in section 402 (c) *supra*, we said:

The expression "all purchasers" does not mean the members of some association only, or 99 per centum of the purchasers of such goods, or those who would not thereafter buy such goods from someone else, but it does mean all of those who cared to buy such goods in such markets.

Third, Webster's New International Dictionary, 2nd edition defines the noun "trade" as follows:

Act or business of exchanging commodities by barter, or by buying and selling for money; commerce; traffic; as, international *trade;* adverse influences on *trade;* a slump in the cotton *trade*. *Trade*, in this sense, comprehends every species of exchange or dealing, either in the produce of land, in manufactures, in bills, or in money; but it is chiefly used to denote the barter or purchase and sale of goods, wares, and merchandise, either by wholesale or retail.

In the light of this definition of the word "trade" we are of the opinion that as applied to the particular question before us the phrase "the ordinary course of trade" found in the statute means the ordinary course of the business of buying and selling X-ray grids in Sweden. Since in exhibit 1 the manufacturer states:

The X-ray grids which I make are the subject of a secret process and are very different in materials, design, and structure from any other X-ray grids made in Sweden.

there can be no other course of trade in Sweden in buying and selling such X-ray grids than that pursued by the manufacturer and exporter of the X-ray grids in issue and by those who purchased from him, and it plainly appears that in the ordinary course of his business he offered them for sale to, and they were purchased by, both consumers and dealers. In exhibit 7 the Treasury attaché reported under the caption "Foreign Value":

In Sweden sales are made to three or four X-ray supply houses (resellers) and to several hundred hospitals and laboratories (users). On a yearly turnover basis, the business is divided about equally between the two types of buyers.

For the foregoing reasons we conclude that, it being established without question that a usual wholesale quantity of grids such as those in issue was, at the time of exportation in the principal market of Sweden, a single unit, all sales made in such quantity must be considered in determining foreign value under section 402 (c), *supra*, and no valid distinction may be made between sales in such quantity when made to consumers or when made to dealers.

We can readily understand that a few fugitive sales made by a manufacturer to consumers at retail prices, although in wholesale

quantities, could not be considered as being in the ordinary course of trade, but such is not the case here. A very substantial portion of the trade in the foreign market, more than 55 per centum, according to the report of the Treasury attaché, exhibit 7, consisted of sales direct to consumers, so that it may not be held that these were unusual or outside the ordinary course of business.

We are not unmindful of the legislative history cited by counsel for the appellee in their brief pointing to the policy of Congress that values for customs purposes are to be predicated upon wholesale prices prevalent in trade and commerce. Suffice it to say that in the tariff acts generally up to and including the Tariff Act of 1913 the valuation provision was based upon "actual market value or wholesale price" but that in the Tariff Act of 1922 and the existing tariff act the term "wholesale price" was omitted and the basis of value made—

the market value or the price at the time of exportation of such merchandise to the United States, at which such or similar merchandise is freely offered for sale to all purchasers in the principal markets of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade * * *

and we find that the sales to consumers of X-ray grids such as those at bar are within the purview of this clearly-worded language.

As hereinbefore stated, the prices at which such grids were sold by the manufacturer were uniform during the period from September, 1937, to July, 1938, within which period the time of exportation, December 7, 1937, lies. During such period the following sales of 8- x 10-inch grids were made:

| Date of Sale | Purchaser | Quantity | Unit Price |
|---|---|---|---|
| To consumers: | | | |
| Dec. 21, 1937 | Vanforeanstalten, Stockholm | 1 | Skr. 165.— |
| Jan. 24, 1938 | Lasarettet, Norrkoping | 1 | 164:10 |
| Jan. 27, 1938 | Sabbatsbergs Sjukhus, Stockholm | 1 | 165.— |
| To dealers: | | | |
| Nov. 29, 1937 | Jarnhs El. A. B., Stockholm | 1 | 123:75 |
| Dec. 28, 1937 | "          " | 1 | 123:75 |
| May 5, 1938 | A. B. Elema, Stockholm | 2 | 100.— |
| July 14, 1938 | Jarnhs El. A. B., Stockholm | 1 | 123:75 |
| Feb. 26, 1938 | A. B. Christian Nissen, Helsingfors, Fin. | 1 | 100.— |
| Apr. 6, 1938 | Aage Havemanns Eftf., Helsingfors, Fin. | 1 | 100.— |
| Nov. 22, 1937 | Dansk Rontgen-Teknik, A. S., Aarhus, Den. | 1 | 100.— |
| Apr. 4, 1938 | Carl Drenck, Copenhagen, Den. | 1 | 100.— |

From the foregoing it appears that the price at the time of exportation of the 8- x 10-inch grids in issue at which such grids were sold or freely offered for sale to all purchasers in Stockholm, Sweden, which appears to have been the principal market, in the usual wholesale quantity, and in the ordinary course of trade, was 165.—Skr., less

2 per centum cash discount (indicated in the Treasury attaché's report), packed, and we so hold.

During the same period the following sales of 12⅝- x 13⅝-inch grids were made:

| Date of Sale | Purchaser | Quantity | Unit Price |
|---|---|---|---|
| To consumers: | | | |
| Nov. 19, 1939 | Lasarettet, Angelholm, Sweden | 1 | Skr. 224:10 |
| Jan. 28, 1938 | Maria Sjukhus, Stockholm | 1 | 224:10 |
| Jan. 4, 1938 | St. Gorans Sjukhus, Stockholm | 2 | 225:— |
| Jan. 5, 1938 | Lasarettet, Kalmar, Sweden | 1 | 224:10 |
| Feb. 24, 1938 | St. Eriks Sjukhus, Stockholm | 1 | 225:— |
| May 21, 1938 | Solbackens San., Kullsveden, Sw. | 1 | 224:10 |
| To dealers: | | | |
| Nov. 23, 1937 | Jarnhs El. A. B., Stockholm | 1 | Skr. 168:75 |
| Nov. 24, 1937 | A. B. Elema, Stockholm | 1 | 150.— |
| Mar. 29, 1938 | " " | 4 | 150.— |
| May 10, 1938 | " " | 1 | 150.— |
| Jun. 14, 1938 | Jarnhs El. A. B., Stockholm | 1 | 168:75 |
| Apr. 4, 1938 | Carl Drenck, Copenhagen, Den. | 1 | 150.— |

Following the same reasoning as in the case of the 8- x 10-inch grids we hold that the price at the time of exportation of the 12⅝- x 13⅝-inch grids at which such grids were sold or freely offered for sale to all purchasers in Stockholm, the principal market in the country of exportation, in the usual wholesale quantity of one or more grids, and in the ordinary course of trade, was 225 Skr. less 2 per centum cash discount, packed.

The foregoing values found for the 8- x 10-inch and 12⅝- x 13⅝-inch grids equal the appraised values.

With respect to the 14- x 17-inch grids, the manufacturer in his affidavit, exhibit 1, states:

From September, 1937 through July, 1938, I made no sales of the type 35.5 x 43 cm. [14 x 17 inch] to ultimate consumers, but I made one sale of this type to a dealer as follows:

| Date of Sale | Purchaser | Quantity | Unit Price |
|---|---|---|---|
| Jul. 25, 1938 | A. B. Elema, Stockholm, Sweden. | 1 | 180.— |

As to the same size the Treasury attaché reported in exhibit 7 as follows:

*Prices.*

No price list is published. The following were said to be the effective inland prices for hospitals and supply houses:

| Size | Hospitals | Supply Houses |
|---|---|---|
| * | * | * |
| 35 x 43 cm. | Skr. 275.00 | Skr. 180.00 |

It will be noted that the 275 Skr. price to hospitals reported by the Treasury attaché is not stated to be based upon any sale or offer to sell. However, in view of the known course of business of the manu-

facturer to sell his grids to consumers at higher prices than those charged to dealers we think it was incumbent upon plaintiff, as part of its *prima facie* case, to establish the price at which the 14- x 17-inch grid was offered to consumers, or, in the alternative, to establish that it was not offered to consumers. Section 402 (c), *supra*, refers to the "price * * * at which such or similar merchandise is freely offered for sale to all purchasers * * *," and the mere fact that there were no sales to consumers would not indicate that there had been no offers for sale. We therefore are of the opinion that plaintiff has failed to meet the burden placed upon it, and the appraised value must be presumed to be the value of the merchandise (sec. 501, Tariff Act of 1930).

As to the 10- x 12-inch size, it appears that such size was manufactured and sold only to the General Electric X-ray Corp. in the United States, and to exclusive dealers in Great Britain, Australia, and South Africa. This, of course, eliminates the possibility of a foreign value for "such" merchandise within the meaning of the statute, but it is urged by the appellant herein that the evidence given in exhibit 1 concerning a 26- x 32-cm. grid should be considered on the ground that the latter was "similar" merchandise within the meaning of the statute. With this we cannot agree since it plainly appears that the latter size is neither such nor similar merchandise to the 10- x 12-inch grids. In exhibit 1 the affiant states:

> The X-ray grids which I make are the subject of a secret process and are very different in materials, design, and structure from any other X-ray grids made in Sweden. Also each kind of X-ray grid which I make is different from the other types of grids which I make, and the sales price for one type is different from, and has no bearing upon, the other types of grids which I make.
>
> *              *              *              *              *              *              *
>
> The nearest thing to the type 25.5 x 30.5 cm. [10 x 12 inch] grids which I make, is the type 26 x 32 cm. grids; however these two grids are not the same thing and they are not commercially interchangeable.
>
> *              *              *              *              *              *              *
>
> As hereinbefore stated, I have not sold the 25.5 x 30.5 grids to anyone except the General Electric X-ray Corp. in the United States, and to exclusive dealers in Great Britain, Australia, and South Africa, and as I also previously stated such grids are of a different type and size from the 26 x 32 cm. grids and these two types of grids are not commercially interchangeable * * *.

While commercial interchangeability is not the criterion upon which merchandise may be determined to be similar or dissimilar to the goods in issue (*United States* v. *Thomas & Co.*, 21 C. C. P. A. 254, T. D. 46788), nevertheless, we are satisfied that they are not similar within the meaning of section 402 (c) since it appears that they are of different types and are not useable for the same purpose.

Since the ultimate consignee in the case at bar was the sole and exclusive agent of the manufacturer in the United States there was

no export value for the 10- x 12-inch grids in issue, and since the evidence discloses that there was no sale of prototype merchandise in the United States prior to the instant importation of 10- x 12-inch grids we may not resort to United States value. *Stern Hat Co.* v. *United States,* 26 C. C. P. A. 410, C. A. D. 48.

Examination of exhibit 1 shows that evidence as to all of the elements specified in section 402 (f) of the Tariff Act of 1930 necessary to establish cost of production has been supplied as to the 10-x12-inch grids as follows:

| | | |
|---|---|---|
| Materials | Skr. | 7. — |
| Manipulation | | 20. — |
| Labor | | 27. — |
| General Expenses | | 29. — |
| Containers, etc. | | 1. — |
| Profit | | 51. — |
| Total | Skr. | 135. — |

and we therefore determine the cost of production of that item to have been as found by the court below.

To recapitulate: We find as to the 8-x10-inch, 12⅝-x13⅝-inch, and 14-x17 inch grids that the foreign value as defined in section 402 (c) of the Tariff Act of 1930 was the proper basis of value for the goods in question, and that at the time of exportation such value for the 8-x10-inch grids was as appraised, 165 Skr., less 2 per centum cash discount, packed, and for the 12⅝-x13⅝-inch grid was as appraised, 225 Skr., less 2 per centum cash discount, packed. Plaintiff having failed to prove a value for the 14-x17-inch grids other than the appraised value, we find the foreign value thereof to have been as appraised, 275 Skr., less 2 per centum cash discount, packed.

As to the 10-x12-inch grid we find that cost of production as defined in section 402 (f) of the Tariff Act of 1930 was the proper basis of value, and that such value was 135 Skr., packed.

To the extent indicated the judgment of the court below is modified, and judgment will issue accordingly.

### DISSENTING OPINION

BROWN, Judge: I feel constrained to dissent because the majority holding, in my opinion, has the effect of increasing the duty paid by levying it on practically a "retail" instead of a "wholesale" basis, as the Congress contemplated, and so expressed itself. Finding that the usual quantity sold is one article, whether sold to the dealer at wholesale, or to the consumer at retail, cannot, in my view, have such legal effect.

The statute contemplates customs taxes based upon "wholesale" transactions only.

When an individual doctor or hospital buys one such X-ray machine, that, in my view, is a "retail" transaction, not a "wholesale" transaction, in legal contemplation, no matter what number of articles makes up the *usual wholesale quantity*, when the same thing is sold at wholesale.