(R.D. 11730)

MAGNESIUM ELEKTRON, INC. *v.* UNITED STATES

Entry Nos. 847837, etc.

(Decided December 10, 1970)

*Gilbert, Segall & Young; Joseph F. Donohue,* associate counsel; *Donohue & Shaw (Joseph F. Donohue* and *Crawford Shaw* of counsel) for the plaintiff.
*Carl Eardley,* Acting Assistant Attorney General (*Steven Sosnov* and *Robert Blanc,* trial attorneys), for the defendant.

LANDIS, Judge: Plaintiff here moves that the decision and judgment entered on June 8, 1970 in *Magnesium Elektron, Inc.* v. *United States,* 64 Cust. Ct. 728, R.D. 11709, be vacated and set aside, and that the case, involving the valuation of seven specialty metal products and three chemical products imported from England, be restored to the calendar for all purposes. In the decision sought to be set aside, I sustained the appraisements on the basis of constructed value under section 402(d) of the Tariff Act of 1930, as amended, in the absence of proofs establishing or negating plaintiff's claimed export value basis under section 402(b), as amended. For that reason I did not reach plaintiff's further claim that United States value was the proper basis for appraisement.

The purpose expressed for the motion is to allow plaintiff to perfect proofs I found lacking in the existing record, namely, proof to establish that, at the times of exportation, the manufacturer selectively sold upon a selected purchaser basis the imported metal products to

plaintiff for export to the United States. Short of that proof, I found it unnecessary to discuss whether the evidence of record established that the metal products were freely sold to plaintiff in the ordinary course of trade at a price that fairly reflected the market value. Plaintiff additionally makes the point that in the context of the constructed value basis of appraisement and presumptions which flow therefrom, as a matter of law, it did not have to negate the existence of an export value.

Defendant opposes the motion on the broad ground that a case should not be restored to the calendar to correct "defects in counsel's original presentation, presenting cumulative evidence, or litigating issues piecemeal."

Upon consideration of the motion and all the proceedings had herein, the decision and judgment entered on June 8, 1970, in this case, is vacated and set aside. Although not mentioned by either side on the motion and not necessary to disposition of the case, upon reconsideration of my statement in the vacated decision that the appraised constructed values were "perforce erroneous", I am now of the opinion that the official papers in evidence are not sufficient to overcome the presumption of correctness attaching to the appraised constructed values. Compare, *Ellis Silver Co., Inc.* v. *United States*, 63 Cust. Ct. 647, R.D. 11688 (1969), review pending, cited in *Greb Industries, Ltd.* v. *United States*, 64 Cust. Ct. 608, R.D. 11691 (1970).

The appraised constructed value basis carries with it a presumption that there is no export value or United States value basis for appraisement. Plaintiff's burden is to overcome that presumption with proof of a price on either export or United States value basis. *United States* v. *Nicholas Gal et al.*, 32 Cust. Ct. 657, A.R.D. 39 (1954). Failure to prove an export value will merely confirm the presumption that there is no export value. It is apparent, therefore, that plaintiff can rely on the claimed United States value basis without disproving the existence of an export value basis for valuation. *United States* v. *Nicholas Gal et al.*, *supra*. Accordingly the sufficiency of plaintiff's proofs both as to export and United States value must be weighed before it can be properly said that, short of proof of a price on a more preferred value basis, the imported merchandise must remain valued at the appraised constructed amounts, *Kobe Import Co.* v. *United States*, 42 CCPA 194, C.A.D. 593 (1955).

Plaintiff, in these appeals for reappraisement, seeks judgment *first:* that United States value or, in the alternative, export value as defined in section 402, *infra*, is the proper basis for valuation of the imported productions, and *second:* that the amount thereof, on either basis, is the same, to wit, the amount set forth in column 4 of the customs invoice (Customs Form 5515), filed with the official papers,

expressed in United States dollars as the price "per lb. C.I.F. New York", less certain nondutiable charges.

Section 402, as amended, provides for the valuation of imported merchandise, in pertinent part, as follows:

(a) BASIS.—Except as otherwise specifically provided for in this Act, the value of imported merchandise for the purposes of this Act shall be—

(1) the export value, or

(2) if the export value cannot be determined satisfactorily, then the United States value, or

(3) if neither the export value nor the United States value can be determined satisfactorily, then the constructed value; * * *

\* \* \* \* \* \* \*

(b) EXPORT VALUE.—For the purposes of this section, the export value of imported merchandise shall be the price, at the time of exportation to the United States of the merchandise undergoing appraisement, at which such or similar merchandise is freely sold or, in the absence of sales, offered for sale in the principal markets of the country of exportation, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings of whatever nature and all other expenses incidental to placing the merchandise in condition, packed ready for shipment to the United States.

(c) UNITED STATES VALUE.—For the purposes of this section, the United States value of imported merchandise shall be the price, at the time of exportation to the United States of the merchandise undergoing appraisement, at which such or similar merchandise is freely sold or, in the absence of sales, offered for sale in the principal market of the United States for domestic consumption, packed ready for delivery, in the usual wholesale quantities and in the ordinary course of trade, with allowances made for—

(1) any commission usually paid or agreed to be paid, or the addition for profit and general expenses usually made, in connection with sales in such market of imported merchandise of the same class or kind as the merchandise undergoing appraisement;

(2) the usual costs of transportation and insurance and other usual expenses incurred with respect to such or similar merchandise from the place of shipment to the place of delivery, not including any expense provided for in subdivision (1); and

(3) the ordinary customs duties and other Federal taxes currently payable on such or similar merchandise by reason of its importation, and any Federal excise taxes on, or measured by the value of, such or similar merchandise, for which vendors at wholesale in the United States are ordinarily liable.

If such or similar merchandise was not so sold or offered at the time of exportation of the merchandise undergoing appraisement, the United States value shall be determined, subject to the foregoing specifications of this subsection, from the price at which such or similar merchandise is so sold or offered at the earliest date after such time of exportation but before the expiration of ninety days after the importation of the merchandise undergoing appraisement.

(d) CONSTRUCTED VALUE.—For the purposes of this section, the constructed value of imported merchandise shall be the sum of—

(1) the cost of materials (exclusive of any internal tax applicable in the country of exportation directly to such materials or their disposition, but remitted or refunded upon the exportation of the article in the production of which such materials are used) and of fabrication or other processing of any kind employed in producing such or similar merchandise, at a time preceding the date of exportation of the merchandise undergoing appraisement which would ordinarily permit the production of that particular merchandise in the ordinary course of business;

(2) an amount for general expenses and profit equal to that usually reflected in sales of merchandise of the same general class or kind as the merchandise undergoing appraisement which are made by producers in the country of exportation, in the usual wholesale quantities and in the ordinary course of trade, for shipment to the United States; and

(3) the cost of all containers and coverings of whatever nature, and all other expenses incidental to placing the merchandise undergoing appraisement in condition, packed ready for shipment to the United States.

\*       \*       \*       \*       \*       \*       \*

(f) DEFINITIONS.—For the purposes of this section—

(1) The term "freely sold or, in the absence of sales, offered for sale" means sold or, in the absence of sales, offered—

(A) to all purchasers at wholesale, or

(B) in the ordinary course of trade to one or more selected purchasers at wholesale at a price which fairly reflects the market value of the merchandise,

without restrictions as to the disposition or use of the merchandise by the purchaser, except restrictions as to such disposition or use which (i) are imposed or required by law, (ii) limit the price at which or the territory in which the merchandise may be resold, or (iii) do not substantially affect the value of the merchandise to usual purchasers at wholesale.

The trial record, relevant to plaintiff's claims as to the basis of valuation and the amounts thereof, consists of the following: the official papers; various documents prepared by plaintiff's accountant (exhibits 1 through 5); an exhibit listing the invoice names of the imported products and the corresponding but different names by which

the imported products were sold in the United States (exhibit 6); plantiff's sales invoices (collective exhibits 7 through 10); and documents reviewed by one of the witnesses in analyzing the capital structure of plaintiff firm (collective exhibit 11). Four witnesses testified for plaintiff. Defendant, in addition to the official papers, introduced in evidence a letter from plaintiff to the customs examiner of|the imported products at New York (exhibit A). The proofs and argument directed to plaintiff's claims are best treated separately.

## Export Value

Mr. Frank Sheara, president of Magnesium Elektron, Inc., plaintiff, testified that he had been with the company since its incorporation in 1951. Plaintiff, he said, is a small company. All the common stock of plaintiff company is owned by Magnesium Elektron, Ltd. with the exception of formal holdings of legal title shares necessary to qualify directors. Magnesium Elektron, Ltd., Mr. Sheara stated, is owned by British Aluminum Company, a British corporation; British Aluminum Company, in turn is controlled by a trust consisting of Tube Investments, Ltd., a British corporation which holds a 51 percent interest and Reynolds Metals Company of Richmond, Virginia, a United States corporation with a 49 percent interest. Mr. Sheara testified, that as a practical matter, plaintiff is an independent company operated by management under control of a board of directors, without instruction or direction from Magnesium Elektron, Ltd., British Aluminum Company, Tube Investments, Ltd., or Reynolds Metals Company.

Mr. Sheara's testimony as to plaintiff's purchase of the imported products from Magnesium Elektron, Ltd., is in sum, as follows: He, himself, negotiated the purchase of the imported products with Magnesium Elektron, Ltd.; the negotiations were on "a hard-length—hard-bargaining basis * * * arms-length type of a transaction"; his purpose was to secure the best possible price that he could for each of the imported products so that he could resell them at a fair profit; he was in no way directed or influenced by the English company in the negotiations; the c.i.f. prices shown in column 4 of the customs invoices are the prices plaintiff paid for the imported products; those prices include packing and represent the best prices he could negotiate with the English manufacturers.

On cross-examination, Mr. Sheara confirmed the manufacturer's statement in the customs invoices that Magnesium Elektron, Ltd. offers the same products as those imported, for sale in England. The manufacturer, it should be noted, declared its home market prices in England in column 6 of the customs invoices in English currency.

Dr. Robert B. Stobaugh, Jr., a member of the faculty and a lecturer on business administration at Harvard University, called to testify by plaintiff, stated that he had written two books on marketing and manufacturing of chemicals; a monograph on the effect of the American selling prices method of tariff valuation on United States chemical exports and imports, and twenty-one articles dealing with such areas as international business, pricing, and market research. He said he had been a speaker at a number of national and international meetings; had testified before the Ways and Means Committee of the United States House of Representatives on tariff valuation, and served as an alternate committee member on Presidential committee called the Public Advisory Committee on Trade Policy. Dr. Stobaugh was present in the courtroom during the testimony of witness Sheara and during the testimony, on the basis of his studies and research, had formed opinions to which he testified, in sum, as follows:

When a firm sells in the export market, it very often sells at a lower price than that in its own domestic market; the prices are generally different but still represent as much money as the firm can get in its domestic market and export market; there are less manufacturers of products in England than in the United States and, therefore, "it's quite reasonable for export prices from England to be lower than domestic prices from England. It's quite reasonable for either a subsidiary or unrelated company to negotiate these prices and get the best arrangement—get the best price it can." Manufacturers are willing and able to accept lower export prices for several reasons which he delineated as:

> * * * one, incremental amount of goods that they are making to sell in the export market, they only incur incremental costs, so they are willing to accept a lower price than they are in their domestic market; secondly, they do not have to give the technical services in the export market that they give in the home market, and these technical services cost—they incur charges in rendering these technical services, so they make the same amount of money if they sell for less in the export market * * *.
>
> \*    \*    \*    \*    \*    \*    \*
>
> —the third point is that frequently the volume in the export market, to a large importer, such as Magnesium Elektron, Incorporated, is a larger volume than to individual companies in the home market; and, therefore, they are willing to take lower prices.

All of the above, Dr. Stobaugh said, is consistent with Mr. Sheara's testimony that plaintiff negotiated the price it paid for the imported products on an "arms-length" basis. It is also consistent with Dr. Stobaugh's own research on the financial relationships between re-

lated companies, more specifically sales prices between related companies, enough for Dr. Stobaugh to testify that:

> * * * typically, the size of firm that Magnesium Elektron, Limited is, is the type firm that would tend to set as high a price as they could—given competitive position, competitive forces—on the sales to their subsidiary. Also, it's the type of firm that typically would not have a large central staff, optimizing, or overlooking every transaction; but, typically, they would have a qualified executive abroad to run the subsidiary as a profit center, and to be responsible for the subsidiary—and this, the behavior of Magnesium Elektron, Incorporated, is exactly consistent with the behavior that I would expect, and found, in my studies of subsidiaries dealing with parents on an arms length negotiation.

On cross-examination, Dr. Stobaugh admitted that he never had occasion to look at the various cost of production and profit figures of Magnesium Elektron, Ltd. in England; that he did not believe seeing the books of Magnesium Elektron, Ltd. would really contribute to the strength of the opinions he testified to on direct examination; that his opinion is "so fortified by an examination of the, of their own [plaintiff's] records, and in comparing them with the profitability of firms generally in the chemical industry, and metals industry, that I [Dr. Stobaugh] don't think visiting the United Kingdom and talking to them about their production records would really strengthen it."

From his study of exhibits 1 through 5 (charts showing plaintiff's alleged prices for the imported products in the United States), Dr. Stobaugh said he calculated that plaintiff's profit on each product appeared to be in the proper range but that plaintiff's overall profit is on the low side of what Dr. Stobaugh would call an appropriate range, so much so that if plaintiff had paid prices any higher than it did for the imported products, its profit would be lower than in an appropriate range.

Export value, *supra*, is, *inter alia*, defined as the price, at the time of exportation, at which the merchandise is freely sold, or, in the absence of sales, offered for sale (A) to all purchasers at wholesale, or (B) in the ordinary course of trade to one or more selected purchasers at wholesale at a price which fairly reflects the market value of the merchandise imported. Plaintiff contends that it is a selected purchaser and that the price it paid fairly reflects the market value of the imported products. On the incorporated facts discussed in the vacated decision, I found that while, at the times of exportation, the only sales Magnesium Elektron, Ltd., had made of the imported products were to plaintiff, evidence that it freely offered to sell to all purchasers for export, as a matter of law, emasculated plaintiff's projected role as a selected purchaser *Aceto Chemical Co., Inc.* v. *United States*, 51 CCPA 121, 127, C.A.D. 846 (1964). Plaintiff's role as a selected purchaser not having been put in issue in the briefs filed on both sides, I

would be inclined, in the absence of other considerations, to grant the motion for rehearing. However, proof that plaintiff is a selected purchaser will not help its case, if I cannot find on the existing record substantial evidence that the price plaintiff paid fairly reflects the market value of the imported products. The legal precedents I shall cite lead me to conclude that the facts of record are insufficient to support such a finding and I defer, therefore, from restoring this case to the calendar for additional proof that plaintiff is a selected purchaser.

The record establishes that the imported products sold to plaintiff were, at the times of exportation, also sold in the home market in England. Column 6 of the invoices shows those prices in English currency. The appraised constructed values are in amounts equal to those shown in column 6. I assume, as did plaintiff's counsel in a question directed to Dr. Stobaugh that the prices plaintiff paid for the imported products are less than the prices at which Magnesium Elektron, Ltd. sold the same products in the home market. Otherwise, there would seem to be no reason for plaintiff to complain as to a higher appraisement on a constructed value basis. Dr. Stobaugh gave a number of valid reasons why manufacturers may sell their merchandise at a higher price in the home market than for export.

The difficulty in the existing record is that I cannot find a single fact to support a finding that all or any of the reasons testified to by Dr. Stobaugh account for the difference in the Magnesium Elektron, Ltd. prices in the home market and for export. On this record and where the parties are related, I deem evidence of the difference vital to determination of whether a price fairly reflects market value under section 402(f)(1)(B). *Globe Shipping Co., Inc.* v. *United States*, 63 Cust. Ct. 639, R.D. 11687 (1969); *Myerson Tooth Corporation* v. *United States*, 64 Cust. Ct. 860, A.R.D. 273 (1970); *C. J. Tower & Sons of Niagara, Inc.* v. *United States*, 60 Cust. Ct. 938, A.R.D. 233 (1968).

Plaintiff argues that *F. W. Myers & Co., Inc.* v. *United States*, 60 Cust. Ct. 716, R.D. 11454 (1968); *Mantell Export Co.* v. *United States*, 58 Cust. Ct. 662, R.D. 11290 (1967); and *John V. Carr & Son, Inc.* v. *United States*, 48 Cust. Ct. 506, Reap. Dec. 10138 (1962), reversed *United States* v. *John V. Carr & Son, Inc.*, 52 Cust. Ct. 599, A.R.D. 165 (1964), affirmed *John V. Carr & Son, Inc.* v. *United States*, 52 CCPA 62, C.A.D. 860 (1965), "make it clear that for the purposes of [s]ection 402, market value is determined not only by an analysis of comparative sales prices but also by the market conditions and practices which control those prices." To be sure there "are no specific guidelines" for determining whether a price fairly reflects the market value, that will apply in all instances. *Globe Shipping Co., Inc.* v.

*United States, supra.* For that determination can only be made in the light of the facts in the particular case.

Plaintiff's argument that, in this case, there is no issue of comparative prices in the home market and for export, suggests that no evidence of comparative sales prices in the home market for export is necessary. Plaintiff cites no precedent to support the suggestion and in *Myerson Tooth Corporation* v. *United States, supra,* this court, on appellate review, rejected argument containing similar overtones.

It is a fact that this case involves import transactions between related parties. It is also a fact that one of the related parties, the manufacturer-seller, sold the imported products in the home market in England and for export. Weighing those two facts persuades me that evidence of the cost difference between the prices in the home market and for export, if any, is imperative to determination of fair value. Cf. *Judson Sheldon International Corporation et al.* v. *United States,* 64 Cust. Ct. 760, R.D. 11713 (1970), review pending.

The proofs being insufficient to establish an export value for the imported products, I next weigh the record as to plaintiff's claim that the imported products should be valued on United States value basis, *supra.*

### United States Value

The United States value of imported merchandise is *inter alia* defined in section 402(c), *supra,* as "the price, at the time of exportation to the United States of the merchandise undergoing appraisement, at which such or similar merchandise is freely sold or, in the absence of sales, offered for sale in the principal market of the United States for domestic consumption, * * * in the ordinary course of trade * * *."

Plaintiff contends that in the case at bar, at the times of exportation, there was a price under the foregoing statute at which merchandise such as the imported products, was freely sold or, in the absence of sales, offered for sale in the United States to all purchasers at wholesale, section 402(f)(1)(A), *supra,* in the ordinary course of trade. The facts bearing upon this issue I next discuss, but in my opinion, they do not substantially support that contention.

Mr. Sheara testified that he takes an active part in selling the imported products in the United States by calling upon customers and negotiating contracts with them. He, in fact, sets the prices at which plaintiff sells the imported products in the United States.

Exhibits 1 through 5, prepared by plaintiff's counsel under Mr. Sheara's supervision, reflect composite columnar summaries of plaintiff's United States business in the imported products at the times of exportation in 1965, 1966, 1967 and 1968. In the column of exhibits 1 through 5 entitled "U.S. Selling Price", Mr. Sheara said, are set forth

the prices the products were sold for in the United States, f.o.b., New York; under the column entitled "Expenses" are sub-columns showing expenses attributable to selling, administration, and finance. Plaintiff, said Mr. Sheara, sells the products listed in exhibits 1 through 5 in a packed condition, and the stated selling prices were constant for the period covered by each exhibit.

Every sale of each product listed on exhibits 1 through 5, according to Mr. Sheara, was not made at the United States selling price stated in the exhibits. The products, he said, were also sold at other prices. Mr. Sheara explained that the United States selling prices which he selected to set forth on the exhibits:

* * * are the prices that would apply to our products when— that would be offered to all of our customers and purchasers under normal conditions. Now, there would be times in which we have made a few small sales at prices higher than have been shown on the exhibit; but in these cases, where higher prices were charged, they were generally, they generally would include—the customer would require extensive technical service, or the company involved might involve risk financing, or there might be both things involved.

*　　*　　*　　*　　*　　*　　*

* * * we made some sales at higher prices than those that were shown on the exhibit. In the cases where we made sales at higher prices, the customer usually required extensive technical service, or he might be an account where risk financing was involved. Now, in no event, however, were the profits derived from such higher price sales greater than what we have expected from sales made at the prices shown on this exhibit.

Now, turning the other way, a customer might negotiate for a large volume purchase of a singular product, or a group of products, and he would negotiate for a period of time—a contract over a period of time. In these instances we would make a concession in the selling price.

In every instance, however, the prices that are shown on the exhibit are the prices at which the product was offered for sale, and they do reflect both the greatest aggregate—they reflect both the greatest number of sales that were made and the greatest aggregate volume of product that was sold.

Mr. Sheara continued with his explanation of the United States selling prices set forth in exhibits 1 through 5, in his replies to questions from counsel as follows:

Q. Referring to those sale prices on Exhibit 1 for identification, do they reflect the prices at which you offered the product for sale to all purchasers in the United States?—A. Yes, this is true.

*　　*　　*　　*　　*　　*　　*

Q. With respect to any circumstance where a price higher than that shown on Exhibit 1 for identification was offered, will you

state whether or not such higher price was offered to all purchasers in the United States?—A. Yes, it would be, under the conditions of the offer.

Q. Now, will you state, when you said, "conditions of the offer," were those the conditions that you referred to a few moments ago?—A. That is correct.

\* \* \* \* \* \* \*

Q. Referring to prices on Exhibit 1 for identification, were these prices available even to the purchasers who paid a higher price, under normal business conditions?—A. Yes, yes, they are. Yes, they were.

Q. Would your testimony with respect to the circumstances of the selling prices shown on Exhibit 1 for identification apply also to Exhibits 2, 3, 4, and 5 for identification?—A. They would.

Mr. Sheara further testified that the principal market for selling the imported products in the United States was New York; that the imported products are sold without restrictions; customers are not selected; that the sales are unrestricted, territorially or otherwise; that no conditions are imposed on sale except that the sale be paid for; that there are no limitations on resale; that he did not know of any products similar, in class or kind, to the imported products being sold or offered for sale for export to the United States, and that his company is the sole seller of the imported products in the United States.

On cross-examination, Mr. Sheara testified that plaintiff does not circulate a price list for the imported products and that plaintiff negotiates with the customer for the prices.

On redirect examination, Mr. Sheara was asked about the negotiations in the following context:

Q. You stated in response to questions from Mr. Sosnov that in making sales you negotiated the price with your customers in the United States.

Will you explain, please, whether such negotiations involved arriving at the same price, or at a different price, for customers purchasing under the same terms and conditions?—A. If the customers were purchasing under the same terms and conditions, the prices of our negotiations would be the same.

\* \* \* \* \* \* \*

Q. I refer to your testimony that you negotiated a price with your customers in the United States, and I ask you whether such negotiated price was a special price for one customer, or a price that was available to any customer purchasing under the same terms and conditions?—A. If the customer purchased under the same terms and conditions, the price was also available to him.

Counsel for defendant pursued the same line of questioning with Mr. Sheara on re-cross-examination, as follows:

Q. You testified that you would offer the same price for different quantities, higher quantities, to all purchasers; is that correct?—A. If the conditions of the purchase were identical.

Q. Would the purchaser know in advance the terms and conditions of another purchase by a different individual?—A. Without specific reference to the other individual, we would say to him, "Look, what we can do for you, if you do this, that, or the other thing, we can bring this price down to this particular area." We would do it in that fashion, without mentioning the name of any other company.

Q. In other words, the terms and conditions of this are within your company's knowledge; is that correct—A. This would be correct.

Query, does the above testimony substantially establish that, at the times of exportation of the imported products, such merchandise was freely sold in the United States to all purchasers at the prices claimed by plaintiff? Mr. Sheara, quite candidly, testified that the exhibits do not purport to show every price at which the imported products were sold. The imported products were sold at higher prices to purchasers requiring technical assistance, and to purchasers requiring risk financing. Price concessions were given to purchasers who bought in substantial quantities. Plaintiff, quite clearly then, did not sell to all purchasers at the prices set forth in exhibits 1 through 5. Therefore, the imported products were not "freely sold" at those prices. *Aceto Chemical Co., Inc.*, v. *United States*, 51 CCPA 121, C.A.D. 846 (1964). Were the imported products freely offered for sale to all purchasers at the claimed prices? Mr. Sheara's testimony is not clear as to whether plaintiff did or did not have a price list for merchandise such as the imported products. He did testify that a price list was not circulated to customers, and he repeatedly testified that the sales and offers were made at prices which he chose to characterize as negotiated with the customers, to which he also gave a nuance of bargaining. Prices arrived at by negotiation and bargaining are not prices at which merchandise is freely sold or offered for sale to all purchasers. *F. B. Vandergrift & Co., Inc.* v. *United States*, 56 CCPA 105, C.A.D. 962 (1969). Plaintiff seeks to isolate the higher price to purchasers considered "credit" risks as "risk sales" outside the "ordinary course of trade" and not to be used in the determination of United States value. No one proposes to find that the "risk sales" testified to by Mr. Sheara establish United States value. Indeed, there is no evidence of the "risk" prices or, any other prices, outside those stated in exhibits 1 through 5. The fact is that plaintiff chose, in the ordinary course of trade, to sell the imported products to various purchasers at different prices which it negotiated with the purchasers. Cf. *United States* v. *American Shipping Co.*, 6 Cust. Ct. 1011, Reap. Dec. 5299 (1941), affirmed *American Shipping Co.* v. *United States*,

29 CCPA 250, C.A.D. 198 (1942). That fact is antithetical to finding a price at the times of exportation at which merchandise such as the imported products was freely sold or offered for sale to all purchasers at wholesale in the United States.

I find as facts:

1. That the merchandise of these appeals for reappraisment consists of seven specialty metal and three chemical products manufactured by Magnesium Elektron, Ltd., Manchester, England, and exported to its related affiliate, Magnesium Elektron, Inc., New York, N.Y., in the years 1965 through 1968.

2. That the imported products are not specified in the final list published pursuant to the Customs Simplification Act of 1956.

3. That customs officials appraised the imported products on constructed value basis under section 402(d) of the Tariff Act of 1930, as amended.

4. That, at the respective times of exportation, Magnesium Elektron, Ltd. freely sold the imported products to Magnesium Elektron, Inc. under section 402 of the Tariff Act of 1930, as amended.

5. That, at the respective times of exportation, Magnesium Elektron, Ltd., also sold the imported products for domestic consumption in England.

6. That the evidence does not establish the price at which the imported products was sold or offered for sale in the United States, for export to the United States under section 402(f)(1)(A) of the Tariff Act of 1930, as amended.

7. That, with respect to plaintiff's contention that Magnesium Elektron, Inc. is a selected purchaser, the evidence does not establish that the prices Magnesium Elektron, Inc. paid for the imported products fairly reflect the market value of the imported products under section 402(f)(1)(B), as amended.

8. That, at the times of exportation, merchandise such as the imported products was sold or offered for sale in the United States, in the ordinary course of trade, to various purchasers at different prices negotiated by Magnesium Elektron, Inc. depending on the conditions of sale.

I conclude as a matter of law:

1. That there is no export value for the imported products, as defined in section 402(b), as amended, *supra*.

2. That there is no United States value for the imported products, as defined in section 402(c), as amended, *supra*.

3. That constructed value, as defined in section 402(d), as amended, *supra*, is the proper basis for the determination of the values of the imported products in these appeals for reappraisement. and that said values are the appraised values.

Judgment will be entered accordingly.