(A.R.D. 165)

United States v. John V. Carr & Son, Inc.

Entry No. 7743.

Second Division, Appellate Term

(Decided January 27, 1964)

John W. Douglas, Assistant Attorney General (Daniel I. Auster, trial attorney), for the appellant.

Barnes, Richardson & Colburn (Joseph Schwartz of counsel) for the appellee.

Before LAWRENCE, RAO, and FORD, Judges; LAWRENCE, J., dissenting

RAO, Judge: This is an application for review of a decision and judgment holding that export value, as defined in section 402(b) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, was the proper basis for determining the value of certain imported metal parts for antivibration mounts used in the production of automobiles, and that such value was as represented by the invoiced and entered values of such merchandise. The decision under review is reported as John V. Carr & Son, Inc. v. United States, 48 Cust. Ct. 506, Reap. Dec. 10138.

It is contended here that the record before the trial judge was inadequate to establish statutory export value and that statutory constructed value, as defined in section 402(d) of the Tariff Act of 1930, as amended, supra, and as returned by the appraiser, should have been held to be the value of the merchandise under consideration.

The provisions in question, as amplified by statutory definitions, are expressed in the following language:

Section 402, as amended, supra:

(b) EXPORT VALUE.—For the purposes of this section, the export value of imported merchandise shall be the price, at the time of exportation to the United States of the merchandise undergoing appraisement, at which such or similar merchandise is freely sold or, in the absence of sales, offered for sale in the principal markets of the country of exportation, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings of whatever nature and all other expenses incidental to placing the merchandise in condition, packed ready for shipment to the United States.

\*     \*     \*     \*     \*     \*     \*

(d) CONSTRUCTED VALUE.—For the purposes of this section, the constructed value of imported merchandise shall be the sum of—

(1) the cost of materials (exclusive of any internal tax applicable in the country of exportation directly to such materials or their disposition, but remitted or refunded upon the exportation of the article in the production of which such materials are used) and of fabrication or other processing of any kind employed in producing such or similar merchandise, at a time

preceding the date of exportation of the merchandise undergoing appraisement which would ordinarily permit the production of that particular merchandise in the ordinary course of business;

(2) an amount for general expenses and profit equal to that usually reflected in sales of merchandise of the same general class or kind as the merchandise undergoing appraisement which are made by producers in the country of exportation, in the usual wholesale quantities and in the ordinary course of trade, for shipment to the United States; and

(3) the cost of all containers and coverings of whatever nature, and all other expenses incidental to placing the merchandise undergoing appraisement in condition, packed ready for shipment to the United States.

\* \* \* \* \* \* \*

(f) DEFINITIONS.—For the purpose of this section—

(1) The term "freely sold or, in the absence of sales, offered for sale" means sold or, in the absence of sales, offered—

(A) to all purchasers at wholesale, or

(B) in the ordinary course of trade to one or more selected purchasers at wholesale at a price which fairly reflects the market value of the merchandise,

without restrictions as to the disposition or use of the merchandise by the purchaser, \* \* \*.

(g) TRANSACTIONS BETWEEN RELATED PERSONS.—

(1) For the purposes of subsection (c) (1) or (d), as the case may be, a transaction directly or indirectly between persons specified in any one of the subdivisions in paragraph (2) of this subsection may be disregarded if, in the case of any element of value required to be considered, the amount representing that element does not fairly reflect the amount usually reflected in sales in the market under consideration of merchandise of the same general class or kind as the merchandise undergoing appraisement. If a transaction is disregarded under the preceding sentence and there are no other transactions available for consideration, then, for the purposes of subsection (d), the determination of the amount required to be considered shall be based on the best evidence available as to what the amount would have been if the transaction had occurred between persons not specified in any one of the subdivisions in paragraph (2).

(2) The persons referred to in paragraph (1) are:

\* \* \* \* \* \* \*

(F) Two or more persons directly or indirectly controlling, controlled by, or under common control with, any person.

Three different parts, said to be essential to the construction of anti-vibration mounts, are here involved. Details as to their identification, entry, and appraisement are as follows:

| Item No. | Invoiced and entered values (U.S.$) | Appraised values (Can.$) |
| --- | --- | --- |
| 00132 | 0.0336 per unit | 4.425 per 100 |
| 00586 | 0.02915 per unit | 3.894 per 100 |
| 00652 | 0.03385 per unit | 4.413 per 100 |

Since much of the evidence concerning prices and values of the subject merchandise was given in terms of 1,000 units, all references hereinafter made will be so expressed.

602

It appears from the record that the parts in issue were manufactured in St. Thomas, Ontario, Canada, by the firm of Clevite, Ltd. They were sold and shipped to Clevite Harris Products, Inc., of Milan, Ohio, with appellee, John V. Carr & Son, Inc., acting as customs broker. Both Clevite, Ltd., and Clevite Harris Products, Inc., are subsidiaries of the Clevite Corp. of Cleveland, Ohio, and it has been admitted that some of the officers and directors of the parent corporation are also officers and directors of the Canadian subsidiary.

Through the testimony of Chester O. Bennett, the assistant appraiser at the port of Detroit, Edward Voigt, the examiner who made the computations for the return of values for this merchandise, Paul Jefferies, a director and sales manager for the exporter, and William D. MacVicar, a chartered public accountant, employed by Clevite, Ltd., as comptroller, all called in behalf of appellee, together with records of shipments, and cost analyses supplied by plaintiff below, plaintiff's exhibits 1–5, the following salient facts were adduced:

Clevite, Ltd., is a manufacturer of various parts for both the automotive and agricultural industries. It produces the parts in issue for its own use in the assembly of antivibration mounts, as well as for sale to two Canadian manufacturers who also assemble antivibration mounts. Apparently, Clevite, Ltd., is the only manufacturer in Canada of this general class of merchandise.

With a capacity to produce parts in excess of those required for Canadian consumption, the exporter negotiated for the sale of its products to Clevite Harris Products, Inc., a readily available customer, whose primary business is the manufacture of antivibration mounts. According to the witness Jefferies, he entered upon the initial transaction in conference with the purchasing agent of the importer at the latter's office in Ohio. Together, they agreed upon a price which was "the highest price that he would pay for these parts, and also the lowest price that we would accept for them." The prices agreed upon were not dictated by the parent corporation, nor by the purchaser, and apparently did not vary by more than one dollar per thousand from the prices charged by one or two American manufacturers from whom Clevite Harris Products, Inc., purchased similar parts. They were prices which Mr. Jefferies stated he would have been willing to quote for the sale of identical items to other American buyers, although, during the period covered by the instant importation, to wit, from July 1, 1958, to October 31, 1958, there were no other American buyers. Sometime later, however, sales were made to one other United States purchaser at the same prices for similar articles.

No restriction as to disposition or use accompanied the sale of these articles, and prices did not vary with the quantities purchased. In the opinion of the witness Jefferies, the prices included the cost of

materials, fabrication, and processing, general expenses and profit, and containers and packing, and fairly reflected the market value of the merchandise for exportation to the United States, since it was a reasonable price, comparable to the general price level in the United States.

Prices for the sale of identical items in Canada were, however, considerably higher. Although there is some testimony that a substantial portion of the difference between Canadian and American prices could be accounted for by a much lower volume of sales to Canadian customers and the consequent cost of set-ups or the frequent changing of dies and equipment, as well as certain domestic selling expenses, it seems clear that the method of determining general expenses in computing manufacturing costs was largely responsible for the variance.

In essence, it is this element which has occasioned the difference between the entered and appraised values, and given rise to the instant litigation. It appears that, in calculating manufacturing costs upon which selling prices were predicated, certain "fixed items of overhead that we would incur in Canada for Canadian production whether we did or did not sell to the United States, such things as taxes, insurance, depreciation, and other fixed elements of that nature that we would incur anyway," were, by the exporter's accounting system, charged only to Canadian operations, and excluded from the computation of export costs. Comparison of the overhead figures, as analyzed in plaintiff's exhibit 5, shows the following with respect to each of the involved parts:

| Item No. | Canadian Cost Basis | Export Cost Basis |
|----------|---------------------|-------------------|
| 00132 | 15.65 | 4.19 |
| 00586 | 14.38 | 3.89 |
| 00652 | 15.18 | 4.08 |

The manufacturer's attitude, in this connection, is revealed by the following testimony from the witness MacVicar:

R. Q. What was your reason for not including the manufacturing salaries such as foremen and so forth, and the items of depreciation, insurance, local taxes, and administrative in the Canadian cost and, not in the export cost?

\* \* \* \* \* \* \*

THE WITNESS: Well, these items to which you are referring are items of a fixed nature in that they do not vary within reasonable limits of production, normal production. They do not vary. We were at that time applying the Canadian market with these certain fixed elements of costs existing. We had additional capacity, we can produce additional products for export purposes without incurring any additional fixed costs.

JUDGE MOLLISON: Is that any real reason why you shouldn't allocate to the export part of your business a fair cost with reference to, we'll say, this kind of overhead?

THE WITNESS: Well, we feel that we don't incur these costs in doing export business, and that those costs are absorbed by our Canadian operation.

JUDGE MOLLISON: In other words, you put it on the Canadian consumer.

THE WITNESS: Well——

604

JUDGE MOLLISON: Is there any justification for that from a cost accounting standpoint or from an economic standpoint?

.. THE WITNESS: We feel it's justified.

BY MR. SCHWARTZ:

. R. Q. Why do you feel it's justified?—A. In that if we did not have the export business we would still be incurring exactly the same costs.

R. Q. Is that consistent with good accounting practice within your experience?—A. I would say yes, sir.

In considering whether or not the evidence of record sufficed to establish statutory export value, in the light of the circumstance that Clevite Harris Products, Inc., was an exclusive purchaser during the period covering the instant importation, the trial court quite properly found the only questionable element to be that arising from the requirement of section 402(f) (1) (B), *supra*, that sales to one or more selected purchasers be at a price which fairly reflects the market value of the merchandise. Although the trial judge acknowledged that "It is not inconceivable that, under some circumstances, evidence that merchandise was being sold at less than its cost to produce might tend to establish that the selling price did not fairly reflect. its market value," he, nevertheless, was of opinion that this was not a proper case for the application of such rule. Assigned as reasons for this conclusion were the following observations:

It must be remembered that the exporter was itself primarily a manufacturer of antivibration mounts made with the use of parts such as those here involved. Whether or not it made any sales for export, it would incur, in producing such parts for itself, fixed and unvarying items of expense, such as taxes, insurance, depreciation, etc., properly attributable to that primary phase of its business. These fixed costs would not increase because of the production of additional parts for export sale, and I see no impropriety in the adoption of export selling prices based upon cost calculations from which they have been eliminated which would bar a finding of export value on the ground that such prices did not fairly reflect the market value of the merchandise.

That such practice was realistic from a commercial standpoint is demonstrated by the fact that the evidence shows that the export selling prices were competitive with the prices charged by American firms for the same components, the difference being within less than a dollar per thousand units.

We find ourselves unable to agree with the foregoing conclusions. In the first place, we do not believe that there is evidence to support the initial premise that "the exporter was itself *primarily* a manufacturer of antivibration mounts made with the use of parts such as those here involved." [Italics supplied.] That the exporter was, in fact, a manufacturer of antivibration mounts we think the record does conclusively establish. But there is a singular lack of evidence tending to show the comparative volume of its production of these parts consumed in its own assembling operations as against those sold in the Canadian market to other producers. All that the record shows,

in this connection, is that the amount produced for sale in Canada was less than the amount produced for exportation to the United States, and that the material available for exportation resulted from a surplus capacity to produce.

The fact that the expansion of operations to fuller limits of its capacity, which afforded the opportunity to supply its American affiliate with the parts in question, did not result in any increase in the fixed expenses adverted to, does not, in our opinion, justify the arbitrary allocation of these fixed costs to the items produced for Canadian consumption.

From an economic standpoint, it seems axiomatic that as output increases, unit costs decrease. This is the primary incentive to greater industrial production and the realization of larger profits resulting from lesser costs. One of the factors necessarily contributing to this result is that within reasonable limits, fixed costs do not increase proportionately with volume, and the allocation of such costs to a greater number of units of production brings about a lower individual cost and, potentially, a larger unit profit.

We have but the simple, "I would say yes, sir," to the question of whether the allocation of fixed costs to a portion of the total production accords with good accounting practice, yet, such a statement seems to run counter to what we consider to be usual business methods and normal accounting procedures. We do not see in this record justification for attributing fixed costs solely to production for the Canadian market, when a substantial portion of the firm's business is devoted to export operations.

Accordingly, we are of opinion that a price which does not embrace all of the elements entering into cost of production does not *per se* fairly reflect the market value of the item sold. This is the tenor of our decision in the case of *United States* v. *Acme Steel Company*, 50 Cust. Ct. 529, A.R.D. 152, appeal pending, No. 5145, wherein we held that evidence that invoice prices were equal to the sum of production costs, including material, labor, general expenses entering into export transactions, and profit, was competent evidence from which a price fairly reflective of market value can be determined. We did not there suggest, and we do not mean here to hold, that general expenses entering into export transactions may be those items of overhead only which the exporter chooses to include in his calculations. We mean, of course, those items of overhead which are reasonably and normally chargeable to export operations.

We also held, in the *Acme Steel Company* case, that in ascertaining the price which fairly reflects the market value of the merchandise, the value of goods in the foreign market is a relevant consideration for the reason that the ordinary course of trade, of which section 402 (f) (1) (B) speaks, contemplates the usual practices surrounding all

sales of such or similar merchandise, whether for domestic consumption in the country of exportation or for exportation to the United States.

The record in the instant case shows a marked discrepancy between the Canadian home prices of these items, and the prices at which they were sold for exportation to the United States, which discrepancy is not attributable to expenses indigenous to Canadian operations and sales. Plaintiff's exhibit 5 sets forth the following figures:

| Part No. | Canadian Selling Price | American Selling Price |
|---|---|---|
| 00132 | 42.50 | 33.60 |
| 00586 | 42.00 | 29.15 |
| 00652 | 46.00 | 33.85 |

An imbalance of this nature tends to suggest that the export prices of the instant merchandise are not fairly reflective of market values and, hence, not within the statutory definition of export value.

Neither do we agree that the circumstance "that the export selling prices were competitive with the prices charged by American firms for the same components, the difference being within less than a dollar per thousand units," can materially affect this conclusion. In the first place, the record does not sufficiently establish whether the stated prices of American items are such as are consistent with the statutory definition of export value, as being freely sold in the usual wholesale quantities and in the ordinary course of trade. Moreover, the "market value of the merchandise," with which section 402(f) (1) (B), supra, is concerned, is the market value of merchandise exported from abroad, and whether or not the price of such merchandise accords with offerings on the American domestic market is an immaterial consideration.

For the foregoing reasons, we are of opinion that the record before the trial court was insufficient to establish statutory export value, and its finding to that effect constitutes reversible error.

Since, in the view taken by the trial court, consideration of constructed value, within section 402(d), supra, was irrelevant, the opinion below contains no discussion thereof. Under authority of United States v. F. W. Woolworth Co. et al., 22 CCPA 184, 191, T.D. 47126, counsel for appellant urges this court to find value, upon the cited alternative basis, and this we deem we are compelled to do under the mandate of our appellate tribunal, if the record is sufficient for that purpose.

Apparently for the reason that he regarded the instant transaction as one between related persons, as defined in section 402(g) (2) (F), supra, and because, in his opinion, the element of general expenses was not an "amount usually reflected in sales in the market under consideration of merchandise of the same general class or kind as the merchandise undergoing appraisement," the appraiser adopted, as the amount for general expenses, the overhead figures included in

the Canadian cost of production basis furnished by the exporter. Appellee contends that he should have found constructed value on the basis of the shipper's export cost figures, from which the said fixed costs had been deducted.

While it is true that the amount which the statute requires shall be added for general expenses and profit is that which obtains in the case of shipment to the United States, it does not follow that the language permits the exporter's self-serving accounting procedures arbitrarily to exclude from general expenses those costs which it does not choose to allocate to export operations. Indeed, it is not the exporter's general expenses, but those "equal to that usually reflected in sales of merchandise of the same general class or kind * * * by producers in the country of exportation," which is the statutory criterion.

Of course, in the instant case, there were no other producers in the country of exportation of merchandise of the same general class or kind. Appellee suggests, therefore, that since the exporter's figures "are based upon the *only* sales in that market during the period in question," "the *only* sales must of necessity be the *usual* sales," [italics quoted] and the amounts reported by the exporter's accountant as general expenses on export sales necessarily fairly reflect amounts usually added for general expenses.

It is obvious that the statutory definition of constructed value is not open to such a construction, especially in the case of transactions between related persons. Surely, such blanket license to a foreign shipper to estimate costs in accordance with his own peculiar accounting standards is susceptible of depressing the values of imported merchandise and of thwarting the statutory objective of reaching a value as far as possible consistent with that which fairly represents market value. Besides the sale which counsel characterizes as the usual sales are the very sales which have been rejected as being between two or more related persons under common control.

If the method selected by the appraiser to determine general expenses is not the best evidence as to what such amount would have been as between unrelated persons, the record is, nevertheless, barren of any other evidence as to what that amount would be, and a constructed value, different from that returned by the appraiser, has not been affirmatively established here.

We are of opinion, however, in view of the particular facts elicited in the instant case, and of the explanation of the differences between the Canadian costs of production, and of the export costs of production, that the appraiser was fully justified in adopting those amounts for overhead which included the fixed costs, hereinabove referred to, in estimating constructed value for the merchandise here undergoing appraisement.

Accordingly, the court makes the following findings of fact:

1. The merchandise covered by this application for review consists of metal parts for antivibration mounts, used in the production of automobiles, exported from Canada on or about October 6, 1958, by Clevite, Ltd., of St. Thomas, Ontario, Canada, and imported by Clevite Harris Products, Inc., of Milan, Ohio.

2. The said merchandise is subject to appraisement under the provisions of section 402 of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956.

3. Appraisement was made on the basis of constructed value, as that value is defined in section 402(d) of said tariff act, as amended.

4. At the time of exportation, the exporter was the sole producer and exporter of such or similar merchandise.

5. The ultimate consignee was an affiliate of the exporter, both being wholly owned subsidiaries of the Clevite Corp. of Cleveland, Ohio.

6. During the period covered by the instant importation, Clevite Harris Products, Inc., was the only United States purchaser at wholesale of the involved merchandise.

7. In estimating production costs for the formulation of the prices at which the instant merchandise was sold to the importer, the exporter failed to include certain fixed costs, such as manufacturing salaries, depreciation, insurance, local taxes, and administrative expenses.

8. Said fixed costs were included in the estimation of production costs from which prices for the sale of such merchandise to Canadian purchasers were derived.

9. The invoiced and entered values, predicated on said so-called export costs, do not fairly reflect the market values of the merchandise.

10. In finding constructed value for the involved items of merchandise, the appraiser adopted amounts for general expenses which included said fixed costs.

11. There is no substantial evidence of record to establish export value, as that value is defined in section 402(b) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, nor to show any other constructed values than those found by the appraiser.

The court, therefore, concludes that:

1. Constructed value, as defined in section 402(d) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, is the proper basis for the determination of the values of the items of merchandise here involved.

2. Such values were the appraised values.

3. The judgment of the trial court is reversed.

Judgment will be entered accordingly.

DISSENTING OPINION

LAWRENCE, Judge: I would affirm on the decision and judgment of the court below.