GREB INDUSTRIES, LTD.
v.
UNITED STATES.
R.D. 11691; Reappraisement R67/14800.

United States Customs Court.
Jan. 16, 1970.

Barnes, Richardson & Colburn, New York City (Joseph Schwartz, New York City, of counsel), for plaintiff.

William D. Ruckelshaus, Asst. Atty. Gen. (Bernard J. Babb, New York City, trial attorney), for defendant.

MALETZ, Judge:

This reappraisement case involves ice skating outfits that were exported in January 1967 by the manufacturer, Greb Industries, Ltd. (Greb), Kitchener, Ontario, to its wholly owned subsidiary Bauer Canadian Skate, Inc. (Bauer), North Tonawanda, New York.[1] The merchandise was entered at Niagara Falls, New York, and was appraised by the district director of customs at Buffalo on the basis of constructed value, as defined in section 402(d) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956 (19 U.S.C. § 1401a(d)).[2]

Plaintiff claims that the proper basis of appraisement is export value, as defined in section 402(b) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956 (19 U.S.C. § 1401a(b)) and that Greb's invoice prices to Bauer represent such value. The issue in this context (as the parties agree) is whether plaintiff has proven that these invoice prices contain all the elements of statutory export value.

Section 402 of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956 (19 U.S.C. § 1401a) reads in part as follows:

(a) *Basis.*—Except as otherwise specifically provided for in this Chapter, the value of imported merchandise for the purposes of this Chapter shall be—

(1) the export value, or

(2) if the export value cannot be determined satisfactorily, then the United States value, or

(3) if neither the export value nor the United States value can be determined satisfactorily, then the constructed value * * *

\* \* \* \* \* \*

(b) *Export Value.*—For the purposes of this section, the export value of imported merchandise shall be the price, at the time of exportation to the United States of the merchandise undergoing appraisement, at which such or similar merchandise is freely sold or, in the absence of sales, offered for sale in the principal markets of the country of exportation, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings of whatever nature and all other expenses incidental to placing the merchandise in condition, packed ready for shipment to the United States.

\* \* \* \* \* \*

(d) *Constructed Value.*—For the purposes of this section, the constructed value of imported merchandise shall be the sum of—

(1) the cost of materials (exclusive of any internal tax applicable in the country of exportation directly

---

1. The facts are set out in the opinion.

2. The merchandise does not appear on the final list, T.D. 54521. The appraised val- ues were the same as the entered values. These entered values—though higher than the invoice prices—were required by the customs authorities.

to such materials or their disposition, but remitted or refunded upon the exportation of the article in the production of which such materials are used) and of fabrication or other processing of any kind employed in producing such or similar merchandise, at a time preceding the date of exportation of the merchandise undergoing appraisement which would ordinarily permit the production of that particular merchandise in the orinary course of business;

(2) an amount for general expenses and profit equal to that usually reflected in sales of merchandise of the same general class or kind as the merchandise undergoing appraisement which are made by producers in the country of exportation, in the usual wholesale quantities and in the ordinary course of trade, for shipment to the United States; and

(3) the cost of all containers and coverings of whatever nature, and all other expenses incidental to placing the merchandise undergoing appraisement in condition, packed ready for shipment to the United States.

\*　　\*　.　\*　　\*　　\*　　\*

(f) *Definitions.*—For the purposes of this section—

(1) The term "freely sold or, in the absence of sales, offered for sale" means sold or, in the absence of sales, offered—

(A) to all purchasers at wholesale, or

(B) in the ordinary course of trade to one or more selected purchasers at wholesale at a price which fairly reflects the market value of the merchandise, without restrictions as to the disposition or use of the merchandise by the purchaser, except restrictions as to such disposition or use which (i) are imposed or required by law, (ii) limit the price at which or the territory in which the merchandise may be resold, or (iii) do not substantially

affect the value of the merchandise to usual purchasers at wholesale.

(2) The term "ordinary course of trade" means the conditions and practices which, for a reasonable time prior to the exportation of the merchandise undergoing appraisement, have been normal in the trade under consideration with respect to merchandise of the same class or kind as the merchandise undergoing appraisement.

(3) The term "purchasers at wholesale" means purchasers who buy in the usual wholesale quantities for industrial use or for resale otherwise than at retail; or, if there are no such purchasers, then all other purchasers for resale who buy in the usual wholesale quantities; or, if there are no purchasers in either of the foregoing categories, then all other purchasers who buy in the usual wholesale quantities.

(4) The term "such or similar merchandise" means merchandise in the first of the following categories in respect of which export value, United States value, or constructed value, as the case may be, can be satisfactorily determined:

(A) The merchandise undergoing appraisement and other merchandise which is identical in physical characteristics with, and was produced in the same country by the same person as, the merchandise undergoing appraisement.

(B) Merchandise which is identical in physical characteristics with, and was produced by another person in the same country as, the merchandise undergoing appraisement.

(C) Merchandise (i) produced in the same country and by the same person as the merchandise undergoing appraisement, (ii) like the merchandise undergoing appraisement in component material or materials and in the purposes for which used, and (iii) approximately equal in

commercial value to the merchandise undergoing appraisement.

(D) Merchandise which satisfies all the requirements of subdivision (C) except that it was produced by another person.

(5) The term "usual wholesale quantities", in any case in which the merchandise in respect of which value is being determined is sold in the market under consideration at different prices for different quantities, means the quantities in which such merchandise is there sold at the price or prices for one quantity in an aggregate volume which is greater than the aggregate volume sold at the prime or prices for any other quantity.

The facts are these: Greb is a manufacturer of footwear and athletic footwear, which includes ice skating outfits and accessories. It sells only to wholesalers, and its selling prices are based upon the full cost of production plus a profit of at least 5 percent before taxes. Bauer has been a wholly owned subsidiary of Greb since October 1965, when the latter acquired it by purchase.

During the period in question, Greb sold its ice skating outfits to all wholesalers in Canada who had a reasonable credit rating and were willing to promote the product. Greb also sold the outfits in Canada to a wholly owned subsidiary corporation which was engaged in the wholesaling business. Greb's invoice prices were the same to all wholesalers in Canada, including its own subsidiary. These prices were based on a "Wholesale" price list that was in effect in and prior to January 1967 and was disseminated to the wholesale trade. Prices contained in this price list did not depend on the quantities purchased. Payment was due in 30 days.

With respect to export to the United States, Greb sold the ice skating outfits only to a single United States purchaser—its subsidiary, Bauer. Greb's sales to Bauer were made at invoice prices that, with few exceptions, were the same as, or higher than, Greb's prices to wholesalers in Canada.[3] Payment on such sales was due in 30 days—the same as on Greb's sales to its Canadian customers.

In the time here relevant, Greb was the only exporter to the United States of Greb products. There were, however, three other Canadian manufacturers of ice skating outfits. In and prior to January 1967, conditions in the ice skating outfit trade as a whole were normal; the merchandise in question was sold under normal conditions and practices and without restrictions as to disposition or use by the purchaser; Kitchener was one of the principal markets in Canada for the sale of ice skating outfits; the prices shown on Greb's wholesale price list were packed prices, ready for shipment to the United States; and the invoice prices to wholesalers in Canada and Bauer in the United States were also packed prices. None of the customers of Greb except Bauer and Greb's wholly owned wholesaling subsidiary in Canada were related to Greb in any way.

Bauer itself is a Delaware corporation. It maintains its own warehouse in North Tonawanda, New York; has its own bank account; files its own income tax returns (which have been accepted by the United States as bona fide for Bauer); and pays its own taxes in the United States. During the period in question, Greb sold the ice skating outfits to Bau-

---

3. It is to be noted that the unit prices in the invoices did not include Canadian federal sales taxes which were added at the bottom of the invoices whenever applicable. A further matter worthy of note is that Greb's overseas sales—which represented not more than 3 percent of Greb's sales for the year ending October 1967—were at higher prices than its wholesale prices for sales in Canada and the United States. This was due to the fact that on overseas sales Greb incurred various costs that it did not incur on sales in Canada and the United States. These costs—which varied from country to country—included export credit insurance, extended credit terms, agency commissions, etc.

er. Greb shipped the outfits to Bauer for warehousing at North Tonawanda, from which point Bauer sold the outfits to its retail-purchasers in the United States.[4]

A separate office staff for Bauer was not economically feasible and, therefore, the same persons who had authority to sign checks for Greb also signed checks for Bauer, with the latter's checks drawn on its bank in the United States. Thus, the comptroller of Greb was responsible for the transfer of funds from Bauer to Greb in payment of invoices, with the checks therefor made out in Kitchener and drawn on Bauer's bank in the United States.

As we have seen, the customs officials at Buffalo required entry to be made at higher values than the invoice prices. These entered values—which were the same as the appraised values— were obtained in the following three different ways that were insisted upon by the customs officials: (1) by using Greb's Canadian wholesale subsidiary's selling price to the retail trade in Canada, less Canadian federal sales tax; (2) as to styles not sold in the Canadian home market, by using Greb's selling price to Bauer plus 25 percent; and (3) as to three specified styles, by using the Bauer selling price to the retail trade in the United States less 2 percent cash discount, less entry and duty.

■ At the outset, it is apparent that these appraised values—which were ostensibly determined on the basis of constructed value pursuant to section 402(d)—were in utter disregard of the statutory standards for constructed value as prescribed by that section and are thus erroneous on their face. See e. g., Ellis Silver Co., Inc. v. United States, 63 Cust. Ct. ——, R.D. 11688 (1969) (slip op. Dec.

31, 1969); United States v. A. N. Deringer, Inc., 46 Cust.Ct. 762, 768, A.R.D. 127 (1961), appeal dismissed 48 CCPA 169 (1961). Notwithstanding such error, it is of course obvious that plaintiff, in order to prevail, must still prove that its claimed values, as represented by the invoice prices, contain all the essential elements of export value. E. g., Brooks Paper Company v. United States, 40 CCPA 38, 41, C.A.D. 495 (1952). Based on the present record, it is concluded that plaintiff has met its burden of proof in this respect.

The first requirement in the definition of export value is that it shall be the price "at which such or similar merchandise is freely sold * * *." The phrase "such or similar merchandise," as defined in section 402(f) (4) (A), means in the first instance:

The merchandise undergoing appraisement and other merchandise which is identical in physical characteristics with, and was produced in the same country by the same person as, the merchandise undergoing appraisement.

■ Thus, if Greb's selling prices to Bauer represent export value, merchandise produced by other manufacturers may not be considered. Chr. Bjelland & Co., Inc. v. United States, 48 Cust.Ct. 593, 598, R.D. 10213 (1962);[5] United States v. F. W. Myers & Co., Inc., 63 Cust.Ct. ——, ——, A.R.D. 264 (1969) (slip op. Dec. 11, 1969, p. 13).

The phrase "freely sold" is likewise defined in section 402(f) (1) as sales or offers (A) to all purchasers at wholesale, or (B) in the ordinary course of trade to selected purchasers at wholesale at a price which fairly reflects the market value of the merchandise without restrictions, etc. The record establishes

4. Also in very unusual circumstances and very infrequently, Bauer sold ice skating outfits to individuals located in places where there were no Bauer dealers. Outfits thus sold consisted of professional skates that differed from standard skates but were kept in stock even though made to order. Such outfits were also sold in Canada.

5. Affirmed in Chr. Bjelland & Co., Inc. v. United States, 51 Cust.Ct. 520, A.R.D. 161 (1963), affirmed in Chr. Bjelland & Co., Inc. v. United States, 52 CCPA 38, C.A.D. 855 (1965).

that Greb sold the merchandise only to a single United States purchaser—Bauer. Therefore category (B), referring to selected purchasers at wholesale, is applicable. Further, since Bauer purchased the merchandise for resale otherwise than at retail, it was a "purchaser at wholesale" within the meaning of section 402(f) (3).

A further requirement of section 402 (f) (1) (B) is that the price be one "which fairly reflects the market value of the merchandise, without restrictions as to the disposition or use of the merchandise by the purchaser * * *." The record establishes that no such restrictions were imposed on the purchasers of the merchandise in question. It also establishes—without dispute—that the selling prices by Greb fairly reflected the market value.

■ In this latter connection, the selling price to a selected customer in the United States has been held to be a price that fairly reflects the market value where the claimant has been able satisfactorily to explain the difference between the foreign home consumption price of the particular manufacturer involved and the selling price of that manufacturer to the selected customer in the United States. It is not necessary to explain the difference to the penny; a reasonable approximation or correspondence is enough. See C. J. Tower & Sons of Buffalo, Inc. v. United States, 56 Cust. Ct. 653, 660, R.D. 11152 (1966); United States v. Lockwood & Freidin, 61 Cust. Ct. 573, 579, A.R.D. 241, 287 F.Supp. 283 (1968).

The leading case on this point is United States v. Acme Steel Co., 51 CCPA 81, C.A.D. 841 (1964), in which Acme Steel of Canada sold steel strapping to its parent company, Acme Steel, Chicago, as a distributor, at prices which were 30 per-

cent below the home consumption prices in Canada. It was held that the export prices fairly reflected the market value of the merchandise for two reasons: (1) the 30 percent differential was due to various selling expenses which Acme Steel of Canada incurred on sales for home consumption but which were not incurred on export sales to the United States, and (2) the invoice prices were equal to the sum of production costs and profit.[6]

■ In the present case, with few exceptions, Greb sold ice skating outfits in Canada to non-related as well as related buyers at the same or lower prices than to Bauer. Thus there is no "differential" to explain in the great majority of Greb's sales to non-related purchasers in the home market. Indeed, it is self-evident that since most of Greb's sales to non-related buyers in the home market were at prices which were not higher than its prices to Bauer, such prices to Bauer must have fairly reflected the market value and obviously were not less than market value.

As for the second basis of decision in *Acme Steel,* the record in the present case likewise shows that Greb sold to Bauer at prices which included the full cost of production plus a profit. It follows that according to both tests laid down in *Acme Steel,* the invoice prices in this case qualify as prices which fairly reflect the market value.

The definition of "export value" further requires that it shall be the price "in the principal markets of the country of exportation." The record shows that Kitchener is one of the principal markets of Canada for the sale of ice skating outfits. Hence there is no issue as to principal markets.

"Export value," as defined in section 402(b), shall be the price "in the usual

6. The principles laid down in *Acme Steel* have been affirmed in a number of subsequent decisions. See e.g., United States v. John V. Carr & Son, Inc., 52 Cust.Ct. 599, A.R.D. 165 (1964) (affirmed John V. Carr & Son, Inc. v. United States, 52

CCPA 62, C.A.D. 860 (1965)); United States v. Lockwood & Freidin, *supra,* 61 Cust.Ct. 573, 287 F.Supp. 283; United States v. F. W. Myers & Co., Inc., *supra,* A.R.D. 264, slip op., pp. 16–22.

wholesale quantities." Here again, the evidence shows that the price of the goods did not vary by reason of the quantities sold. Under these circumstances there is no issue of usual wholesale quantities; for under section 402(f) (5), such an issue arises only when the merchandise is sold "at different prices for different quantities * * *." United States v. Acme Steel Co., *supra*, 51 CCPA at 88.

This brings us to the next requirement of statutory "export value," which is that the sales be "in the ordinary course of trade." From the record it is clear that the sales in dispute were made under the conditions and practices which were normal in the export trade to the United States with respect to ice skating outfits. This satisfies the definition of "ordinary course of trade" as specified in section 402(f) (2).

Defendant, however, argues that plaintiff did not prove that Greb's sales to Bauer were at *prices* which were in the ordinary course of trade. Pointing out that there were three other Canadian manufacturers of ice skating outfits, defendant asserts that in order to prove that the sales in question were in the ordinary course of trade, "it was incumbent upon plaintiff to offer evidence regarding the other manufacturers." Thus, defendant's position, in effect, is that an importer, in order to comply with the "ordinary course of trade" requirement, must show the *prices* at which *other* manufacturers sold their merchandise. There is a basic difficulty, however, with the entire premise of the argument. The difficulty is that defendant is equating "ordinary course of trade" with "price" even though there is not a word about *price* in the statutory definition of "ordinary course of trade." All that the statute requires for export value is that the export sales of such or similar merchandise be in the ordinary course of trade, which is defined in section 402(f) (2) as *normal* in the trade under consideration. In this connection, it is noted that section 402(f) (1) (B) says "in the ordinary course of trade" to selected pur-

chasers at a price which fairly reflects the market value. The section does *not* say at prices obtained by other manufacturers in the ordinary course of trade; it says rather that the *sales* must be in the ordinary course of trade. Put otherwise the statute requires that the *sales* under consideration be made in the ordinary course of trade, i. e., under conditions that were *normal* with respect to merchandise of the same class or kind. And as to this, plaintiff proved that conditions in the ice skating trade were normal and that the merchandise was sold under normal conditions—which is enough to satisfy this requirement.

■ Defendant further argues that "the dictates of the statute require us to compare the circumstances of the sale and hence, the price of identical merchandise to the circumstances of the sale of merchandise of the same class or kind by other producers in order to determine whether the sale of the identical merchandise by the producer in question was made in the ordinary course of trade." Again, however, defendant is equating "circumstances of sale" and "price" and is arguing in effect that if the price of *identical* merchandise does not equal the price of merchandise of the same class or kind by other producers, it is not a sale in the ordinary course of trade. Under this theory, if the price of identical merchandise is below the price of goods produced by other manufacturers, the sale of the identical merchandise would not be in the ordinary course of trade—something not required by the statute. The requirement that merchandise be sold *in the ordinary course of trade* and at *prices which fairly reflect the market value* are separate and distinct requirements. One is not a condition precedent for the other—and the statute does not make it so.

■■ Additionally, defendant argues that plaintiff was required to show that Greb's *Canadian* sales were made in the ordinary course of trade. The statute contains no such requirement; it requires rather that Greb's *export* sales should be made in the ordinary course of

trade, at *prices* which fairly reflect the market value. This latter requirement plaintiff has satisfied by proof that they were prices which were not less than the prices at which Greb sold such merchandise in the Canadian market. And further, the record establishes in any event that the Canadian sales were in fact made in the ordinary course of trade.

Nor do the four cases relied upon by defendant support its position that there is a failure of proof with respect to the requirement of "ordinary course of trade." In two of these cases, Inter-Maritime Forwarding Co., Inc. v. United States, 51 Cust.Ct. 529, A.R.D. 162 (1963), and Inter-Maritime Forwarding Co., Inc. v. United States, 60 Cust.Ct. 930, A.R.D. 232 (1968), the issue—quite different from the one here—was whether certain discount practices were in the ordinary course of trade, as the importer contended. There was positive evidence that the transactions between the exporter and the importer were *not* in the ordinary course of trade and the court rejected the claim. There is, of course, no such evidence in this case. In National Carloading Corporation v. United States, 57 Cust.Ct. 758, A.R.D. 215 (1966), there was positive evidence again that the transactions between the exporter and the importer were not in the ordinary course of trade. And in Henry Picard, Jr. v. United States, 57 Cust.Ct. 689, R.D. 11242 (1966), there was no evidence whatever that the conditions in the trade as a whole at or prior to the time of exportation were normal. This is not the fact in the present case.

Finally, defendant asserts that "there is a question whether the transaction between * * * [Greb] as exporter and Bauer * * *, the alleged purchaser, is a sale or, at least, whether the proof herein should have been more detailed to establish a sale."

■ As defendant points out, a sale is defined as a contract by which the absolute ownership of property is transferred from one person to another for a price, sum of money, or other consideration. J. H. Cottman & Co. v. United States, 20 CCPA 344, 356, T.D. 46114 (1932). The record in this case meets that test without contradiction. Nor is it material that the accounting records of Bauer are maintained in Kitchener at the offices of Greb and that the checks of Bauer are signed in Kitchener by officers of Greb who are also officers of Bauer. For the record shows that Bauer is a separate legal entity; it has its own warehouse in North Tonawanda, maintains its own bank account in the United States, and pays its own taxes in the United States. It pays for the goods it buys from Greb from its own account, and payment is due in 30 days as in all other sales by Greb. Further, it warehouses the merchandise until it resells it in the United States.

■ The mere fact that for the sake of economy the purely ministerial tasks of accounting and check signing are performed in Kitchener instead of North Tonawanda does not change the transactions from bona fide sales into something else. Simply because Bauer is a wholly owned subsidiary of Greb or that the one controls the other, or that the one allows its personnel to keep the books of the other, is insufficient to conclude that a transfer of goods from one to the other is not a bona fide sale within the meaning of section 402. What is more, the transactions must have been regarded as sales by the district director of customs because he appraised some of the goods upon the basis of the *resale* price by Bauer in the United States. This could only have been on the theory that the transfers to Bauer were absolute sales—otherwise there could not have been any sales in turn by Bauer.

In summary, it is held that export value is the proper basis of appraisement and that the invoice prices represent such value. Judgment is entered accordingly.