(R.D. 11740)

Mitsui & Co. (U.S.A.), Inc. *v.* United States

(Decided April 8, 1971)

*Barnes, Richardson & Colburn* (*Hadley S. King, Earl R. Lidstrom* and *David O. Elliott* of counsel) for the plaintiff.

*L. Patrick Gray, III,* Assistant Attorney General (*Herbert T. Posner* and *John A. Winters,* trial attorneys), for the defendant.

Rosenstein, Judge: The merchandise involved herein consists of certain textile machinery (water jet looms and spare parts) manufactured by Nissan Motor Co., Ltd., of Tokyo, Japan (hereinafter called Nissan), and exported from Yokohama, Japan on or about August 31, 1967. The buyer, Mitsui & Co. (U.S.A.), Inc., of New York City (hereinafter called Mitsui-U.S.A.) entered the equipment at the invoiced unit prices, which totaled $8210.44 (2 looms at $3700 each and $810.44 for the spare parts). The shipment was appraised on the basis of export value, as defined in section 402(b) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, at (as indicated in red ink by the district director on a sheet attached to the consumption entry) "invoice unit prices net, pkd, plus chg marked x". The charge marked "x" is a "buying agent commission" of 6⅔ percent allegedly paid by Mitsui-U.S.A. to Mitsui & Co., Ltd., of Yokohama, Japan (hereinafter called Mitsui-Japan). The values of the various items were separately marked in red on the consumption entry by the district director.

Plaintiff agrees that export value is the proper basis of appraisement herein, and concedes that Mitsui-U.S.A. and Mitsui-Japan are related persons within the meaning of the valuation statute, but contends that the invoiced unit f.o.b. prices represent the correct export values herein.

The pertinent provisions of section 402 of the Tariff Act of 1930, as amended, *supra*, are as follows:

> (b) Export Value.—For the purposes of this section, the export value of imported merchandise shall be the price, at the time of exportation to the United States of the merchandise undergoing appraisement, at which such or similar merchandise is freely sold or, in the absence of sales, offered for sale in the principal markets of the country of exportation, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings of whatever nature and all other expenses incidental to placing the merchandise in condition packed ready for shipment to the United States.

> \*　　\*　　\*　　\*　　\*　　\*　　\*

> (f) Definitions.—For the purposes of this section—
> (1) The term "freely sold or, in the absence of sales, offered for sale" means sold or, in the absence of sales, offered—
> (A) to all purchasers at wholesale, or
> (B) in the ordinary course of trade to one or more selected purchasers at wholesale at a price which fairly reflects the market value of the merchandise,
> without restrictions as to the disposition or use of the merchandise by the purchaser, except restrictions as to such disposition or use which (i) are imposed or required by law, (ii) limit the price at which or the territory in which the merchandise may be resold, or (iii) do not substantially affect the value of the merchandise to usual purchasers at wholesale.

The record consists of the testimony of Fumio Otsuka on behalf of plaintiff, an affidavit of T. Inuzuka, and a foreign agent's report, together with attached exhibits.

Otsuka, an employee for Mitsui-Japan from 1957 to August 1967, has been, since the latter date, with Mitsui-U.S.A. in its Textile Machinery Section. The witness, who stated that he was familiar with the transaction at bar, testified that when he received a purchase order from Mitsui-U.S.A., he issued a purchase order on behalf of that company to Nissan and, upon confirmation by Nissan of the purchase, notified Mitsui-U.S.A. There was a buying agency agreement between Mitsui-Japan and Mitsui-U.S.A., but the witness could not produce the original document or explain its absence. The services performed by Mitsui-Japan for Mitsui-U.S.A. included issuing purchase orders on behalf of Mitsui-U.S.A., arranging for shipment of the merchan-

dise, documenting the transaction, and paying Nissan in Japanese currency. He identified T. Inuzuka as the man in charge of export sales of the instant merchandise for Nissan.

Inuzuka stated, in his affidavit, that he had been employed by Nissan since 1954 and was in charge of export sales of the jet looms since May 1966. All sales, he testified, are made at the Tokyo office; the price does not vary with the quantity purchased and includes, in the case of export sales, the cost of delivery to the port of Yokohama. He, in effect, corroborated Otsuka's testimony as to how Mitsui-U.S.A.'s purchase orders were received and confirmed, how Nissan issued its invoices and received payment, and as to the price of the machines in issue. These prices are still in effect and are the same for all markets, including Japan. Since January 1967, all sales to the United States have been made exclusively to Mitsui-U.S.A.

Inuzuka, who personally participated in the sale of the subject merchandise, stated that the payment received was not shared with either Mitsui-U.S.A. or Mitsui-Japan and that he knew Nissan sold to Mitsui-U.S.A. Nissan has no relationship with either Mitsui-U.S.A. or Mitsui-Japan and would sell to either company at the same price.

The foreign agent's report, initiated to determine the validity of a buying agreement between Mitsui-U.S.A. and Mitsui-Japan, deals largely with transactions in which Nissan was not the manufacturer. The agent does report an interview with Satoshi Takahashi and Toshio Inuzuka, employees of Nissan, who stated that they had full knowledge of that company's business practices and policies. They stated that Nissan never made an offer of sale directly to Mitsui-U.S.A.; that it was Nissan's policy to have sales made through Mitsui-Japan; and that it was impossible for Mitsui-U.S.A. to purchase directly from Nissan. However, this was Nissan's policy and did not involve any exclusive agreements. There are no agreements, special interrelationships or financial arrangements existing between Nissan and either company. Neither Mitsui-U.S.A. nor Mitsui-Japan advanced funds, materials, or anything else to Nissan. They also said that title to the merchandise passed directly from Nissan to Mitsui-U.S.A. when the goods were placed on board the exporting vessel.

The agent also interviewed N. Sugo and J. Kawanaka, employees of Mitsui-Japan, who stated that they were familiar with their company's practice concerning the purchase and sale of textile mchinery. They said that Mitsui-Japan obtained f.o.b. price quotations from Nissan and then advised Mitsui-U.S.A. of these prices and the amount of its commission. After Mitsui-U.S.A. found a purchaser in the United States, it would issue a purchase order to Mitsui-Japan at the agreed f.o.b. Japan price plus the commission. A sales note was then

prepared by Mitsui-Japan for the foregoing price and countersigned by Mitsui-U.S.A. which opened its letter of credit to Mitsui-Japan at the f.o.b. price plus commission.

Nissan agreed to sell only through Mitsui-Japan which acts as a buying agent for Mitsui-U.S.A. The Textile Machinery Department of Mitsui-Japan buys only on instructions from Mitsui-U.S.A. The latter company and Mitsui-Japan have been separate entities since April 1966. Title to the merchandise passes from Nissan to Mitsui-Japan when the merchandise is placed on board the exporting vessel, and passes to Mitsui-U.S.A. when the merchandise has been shipped and the letter of credit has been negotiated. Mitsui-Japan advances funds to Nissan and to other manufacturers because the latter are small and do not have sufficient finances. However, there is no financial interest between Mitsui-Japan and the manufacturers.

Plaintiff claims that the invoiced unit prices represent statutory export value under section 402(b) on the basis of sales of such merchandise to "selected purchasers at wholesale" as that term is defined in section 402(f)(1)(B) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956.[1]

Citing *United States* v. *Supreme Merchandise Company*, 48 Cust. Ct. 714, A.R.D. 145 (1962), and *United States* v. *Nelson Bead Co.*, 42 CCPA 175, C.A.D. 590 (1955), plaintiff, in effect, maintains that the appraisement is severable; that, consequently, it may rely upon the district director's presumptively correct return with respect to the invoiced unit prices and challenge only the addition of 6⅔ per cent; and that the buying commission is *bona fide*, hence forming no part of the dutiable value of the merchandise.

Defendant concedes that the invoiced commission was disallowed as a nondutiable item, but claims that it was added back to the "total entered price" of the merchandise; and concludes from this that the appraisement is not separable as a single value is shown for each item on the consumption entry. The government also contends that the commission is not *bona fide* and that plaintiff has failed to show that the sales prices herein fairly reflected the market value of the merchandise as required in the case of sales to a selected purchaser under section 402(f)(1)(B).

We disagree with defendant on all counts.

The official action taken by the district director with respect to his finding of value is stated on the sheet attached to the entry and is expressed, not in terms of a *total* price plus a charge, but of invoice unit *prices* (listed separately on that sheet for each item) plus the alleged buying commission charge. If the invoice unit prices and

---

[1] Both parties agree that Mitsui-U.S.A. is a selected purchaser at wholesale.

other charges are separately stated on the invoices and the appraising officer's finding of value is expressed in terms of the invoice unit prices, plus the questioned charges, the appraisement is deemed to be separable. *United States* v. *Supreme Merchandise Company, supra; United States* v. *Dan Brechner et al.*, 38 Cust. Ct. 719, A.R.D. 71 (1957). Under the rule expressed in *United States* v. *Fritzsche Bros., Inc.*, 35 CCPA 60, C.A.D. 371 (1947), a party to a reappraisement proceeding may challenge one or more of the elements entering into an appraisement, while relying upon the presumption of correctness of the official return as to all other elements, whenever the challenged items do not disturb the effect of the remainder of the appraisement. In the case, as here, of an appraisement at f.o.b. invoice unit prices plus charges, the charge may be disputed without the necessity of proof that the invoice unit prices comply with the statutory definition of export value. *United States* v. *Dan Brechner et al., supra; Ontario Stone Corporation* v. *United States*, 65 Cust. Ct. 753, R.D. 11727, 319 F. Supp. 923 (1970).

Accordingly, I find that the appraisement is separable; and that if plaintiff can establish that the commission was *bona fide* and that such merchandise [2] was sold or freely offered for sale in the ordinary course of trade to Nissan at prices which fairly reflected the market value within the framework of the export value formula as expressed in sections 402(b) and 402(f)(1)(B), then it will be presumed, under the separability rule, that the f.o.b. invoice unit prices used by the district director were the prices at which the merchandise was freely sold or offered for sale to all. *United States* v. *Pan American Import Corp., et al.*, 57 CCPA 134, C.A.D. 993 (1970).

Whether or not an alleged buying commission is *bona fide* depends upon the facts and circumstances of the transaction in issue. *United States* v. *Nelson Bead Co., supra; Dorf International, Inc., et al.* v. *United States*, 61 Cust. Ct. 604, A.R.D. 245 (1968). Although there are some statements in the agent's report to the contrary, I find, on balance, that the weight of the evidence establishes a buying agency relationship herein; that Mitsui-Japan performed the services of a buying agent on behalf of its principal, Mitsui-U.S.A. (see *Shalom Baby Wear, Inc.* v. *United States*, 54 Cust. Ct. 526, R.D. 10905 (1965)) ; and that title passed directly from Nissan to Mitsui-U.S.A.

---

[2] The phrase "such or similar merchandise" as defined in section 402(f)(4)(A) of the Tariff Act of 1930, as amended *supra*, means in the first instance:

(A) The merchandise undergoing appraisement and other merchandise which is identical in physical characteristics with, and was produced in the same country by the same person as, the merchandise undergoing appraisement.

The selling price of *such* merchandise was utilized by the district director in the appraisement. As this is not in dispute, merchandise produced by other manufacturers need not be considered. See *United States* v. *F. W. Myers & Co., Inc.*, 63 Cust. Ct. 706, A.R.D. 264, 306 F. Supp. 1396 (1969).

Failure to produce the original of the alleged agency agreement is not fatal to plaintiff's claim. Although parol evidence may not be introduced to vary the terms of a written contract, it may be offered to show a *de facto* agency with respect to the particular transaction: there is no limitation upon the competency of a witness to attest to his personal performance and experience in connection with the material facts of the transaction in issue. *Haddad & Sons, Inc.* v. *United States*, 53 Cust. Ct. 428, R.D. 10830 (1964).

I note Inuzuka's uncontradicted statements that the imported water jet looms produce fabric by a process unlike that of any other commercial loom; that all sales were made from Nissan's Tokyo office; that the prices did not vary with the number of machines purchased;[3] that the spare parts were always billed as extras; that the prices in all cases included the cost of delivery to the customer in Japan or, in the use of sales for export, to the port of Yokohama; and that, as of January 1967, Nissan set a single uniform basic price for the machines for *all markets*, which included Japan, the United States and Europe.

As the price of the goods did not vary by reason of the quantities sold, there is no issue of usual wholesale quantities. Nor is there an issue as to principal markets: Tokyo was the only and, therefore, the principal market for such merchandise.

The record also establishes that the selling prices herein fairly reflected the market value of the merchandise in question. The selling price to a selected purchaser in the United States has been held to be a price that fairly reflects the market value where the claimant has been able satisfactorily to explain the difference between the foreign home consumption price of the particular manufacturer involved and the selling price of that manufacturer to the selected purchaser in the United States. *United States* v. *Acme Steel Co.*, 51 CCPA 81, C.A.D. 841 (1964); *United States* v. *F. W. Myers & Co., Inc.*, 63 Cust. Ct. 706, A.R.D. 264, 306 F. Supp. 1396 (1969).

In the present case there is no differential to explain. As Nissan's sales of such merchandise to all buyers in *all* markets were at the same basic uniform price (accounting for differences in local currency), the prices to Mitsui-U.S.A. must have fairly reflected the market value and obviously were not less than market value. *Greb Industries, Ltd.* v. *United States*, 64 Cust. Ct. 608, R.D. 11691, 308 F. Supp. 88 (1970).

I also find that the sale herein was made in the ordinary course of trade, as that term is defined in section 402(f)(2)[4] although this

---

[3] Although the agent's report states that Nissan and some other manufacturers interviewed stated that f.o.b. Japan prices were negotiated on a "case by case basis" with Mitsui-Japan, there is no indication that this practice ever applied with respect to the subject merchandise.

[4] Section 402(f)(2) provides—

(2) The term "ordinary course of trade" means the conditions and practices which, for a reasonable time prior to the exportation of the merchandise undergoing appraisement, have been normal in the trade under consideration with respect to merchandise of the same class or kind as the merchandise undergoing appraisement.

point was not raised as an issue by defendant. Exhibit A indicates that none of the other Japanese manufacturers of textile machinery interviewed by the customs agent dealt directly with the United States purchaser. They either sold the merchandise to the United States principal through its buying agent (Mitsui-Japan) or sold it outright to Mitsui-Japan or Toyo, Ltd. (another Japanese firm), which, in turn, sold the merchandise for export to the United States. All the manufacturers sold f.o.b. Japan (or f.o.b. port of exportation if sold for export). Most obtained partial advance payment of the purchase price and none had restrictions on the resale or use of the merchandise, or had a financial interest in or corporate interrelationship with the purchaser. Quantity discounts were only "infrequently" granted.

The foregoing appear to have been the conditions and practices normal in the trade with respect to merchandise of the class or kind as that at bar during the period relevant for consideration. Accordingly, the sale at bar satisfies the "ordinary course of trade" requirement of section 402(f)(2).

In summary, plaintiff has shown that the invoiced unit prices herein were the prices at which such merchandise was freely sold in the principal markets of Japan in the ordinary course of trade, in the usual wholesale quantities for exportation to the United States, within the meaning of sections 402(b) and 402(f)(1)(B).

I therefore, find as facts:

1. That the merchandise in question consists of two sets of Prince Water Jet Looms and spare parts exported from Yokohama, Japan on or about August 31, 1967.

2. That the merchandise was appraised on the basis of export value, as defined in section 402(b) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, at the invoiced unit prices, net packed, plus the separately itemized charge of 6⅔ percent, the latter representing a "buying commission" charge paid by Mitsui & Co. (U.S.A.), Inc., to Mitsui & Co., Ltd., of Tokyo, Japan.

3. That the merchandise under appraisement was manufactured and sold for export by Nissan Motor Co., Ltd., of Tokyo, Japan to Mitsui & Co. (U.S.A.), Inc.

4. That Tokyo is the principal market in Japan for such merchandise, and that the prices at which such merchandise was sold did not vary with the quantities purchased.

5. That the sale at bar was made on an arm's length basis, without restrictions imposed on the disposition or use of the merchandise.

6. That Mitsui & Co. ( U.S.A.), Inc., was a selected purchaser, and that the conditions and practices surrounding the sale of said merchandise were normal for the type of trade herein involved.

7. That the prices at which Mitsui & Co. (U.S.A.), Inc., purchased such merchandise were. the same as the prices at which the seller sold such merchandise to others in the home market and in third countries.

8. That at the time of exportation, the prices at which such merchandise was freely sold in the principal market in the country of exportation, in the ordinary course of trade for exportation to the United States, including the cost of export packing and all other expenses incidental to placing the merchandise in condition ready for shipment to the United States, were the prices at which Nissan Motor Co., Ltd., sold the merchandise. These prices are the invoiced f.o.b. unit prices.

9. That at all times pertinent hereto, Mitsui & Co., Ltd., of Tokyo, Japan acted on behalf of and as the purchasing agent for the plaintiff importer herein.

I conclude as matters of law:

1. Export value, as that value is defined in section 402(b) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, is the proper basis for determining the value of the imported merchandise involved herein.

2. Such export values are the invoiced f.o.b. unit prices, net packed, not including any additional invoiced charge for buying commission.

Judgment will be entered accordingly.